### DAVIS, Agent, v. PHILLIPS A. RYAN LUMBER CO. (No. 2679.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 22, 1923. Rehearing Denied March 8, 1923.)

**1. Contracts ⬡15—Tripartite contract not binding until all have accepted it.**

A 'tripartite contract is not binding upon any one of the parties until all have executed or accepted it.

**2. Contracts ⬡10(1)—Director General's agreement to allow lumber company to operate trains on road held unenforceable as unilateral.**

An agreement between a lumber company and the Director General of Railroads, whereby the lumber company was to be allowed to operate its trains upon the lines of a certain railroad for a stated amount per train mile, the agreement, being unilateral and no more than the concession of a privilege to the lumber company to operate its trains for the price stated if it chose to do so, was unenforceable as to the Director General.

**3. Railroads ⬡138, ⬡5½, New vol. 6A Key-No. Series—Contract for use of track, held not to bind Director General for damages under prior invalid contract, and if so intended was beyond his powers.**

Where an agreement between a lumber company and the Director General of Railroads, allowing the lumber company to operate trains on a railroad for a stated price, was unenforceable as against the Director General because unilateral, the lumber company could not recover, under a subsequent modified contract dated back to the date of the first contract, for damages because the Director General had refused to allow plaintiff to operate its trains under the first contract, and if so construed was unenforceable, since no damages having accrued under the first contract the Director General could not, by the modified contract, bind his government for a sum which it did not owe.

Error from District Court, Cherokee County; L. D. Guinn, Judge.

Action by the Phillips A. Ryan Lumber Company against Jas. C. Davis, Agent. Judgment for plaintiff, and defendant brings error. Reversed and rendered.

Marsh & McIlwaine, of Tyler, for plaintiff in error.

Mantooth & Collins, of Lufkin, for defendant in error.

HODGES, J. The Phillips A. Ryan Lumber Company is a private corporation and owns a mill situated near the town of Lufkin, Angelina county. It filed this suit against the Director General for the purpose of recovering a sum of money which it claims it was entitled to under the terms of a contract hereinafter stated. Some time prior to February 20, 1919, the Phillips A. Ryan Lumber Company had an understanding with the Director General of Railroads whereby it was agreed that the lumber company should have the right to run its engines and log cars and transport its logs from Pollock, over the railroad of the St. Louis Southwestern Railway Company of Texas, to its sawmill at Lufkin, Tex., a distance of 12 miles. On the date above mentioned, a written contract was agreed upon and signed by the Director General of Railroads, acting through J. L. Lancaster, federal manager, and the Phillips A. Ryan Lumber Company, embodying the detailed provisions relating to the transportation of the trains of the lumber company as above stated. The preamble of that contract is as follows:

"This agreement made and entered into this the 20th day of February, 1919, by and between Walker D. Hines, Director General of Railroads, party of the first part, and St. Louis Southwestern Railway Company of Texas, party of the second part, and Phillips A. Ryan Lumber Company, a corporation, party of the third part, for the operation of log trains between points mentioned in said contract to a connection with the tramroad to be hereafter constructed by the party of the third part, witnesseth."

Then follow the detailed stipulations, which, in substance, provide that the lumber company is to have the right to operate a train of its own over the railway line between Pollock and Lufkin, in consideration of the payment by it to the Director General of $1 per train mile, or $24 for a round trip. There were other stipulations, relating to turning charges and liability for damages to third parties resulting from the operation of the trains of the lumber company. The concluding paragraph of this contract is as follows:

"This contract shall be effective as of date February 20, 1919, and shall continue for a period of ten years, ending the 20th day of February, 1929. But upon termination of fed-

---

eral control party of the second part (the St. Louis Southwestern Railway Company of Texas), its successors and assigns, shall have option at any time during the continuance of this contract to cancel same upon giving thirty days' notice in writing of its desire and intention to cancel same."

This written contract was signed by J. L. Lancaster, federal manager, for the Director General of Railroads, and by the Phillips A. Ryan Lumber Company, and was approved as to operation by A. G. Whittington, general manager, but was not otherwise agreed to by the St. Louis Southwestern Railway Company of Texas. Soon after this contract was executed as above stated a new federal manager, W. N. Neff, took charge of the operation of the St. Louis Southwestern Railroad and desired certain modifications of the terms of the written agreement. After several conferences, a second contract was agreed to and executed by Neff for the Director General, by the Phillips A. Ryan Lumber Company, and by the railway company. The second contract contains substantially all the stipulations embraced in the first, with some modifications. It required the lumber company to execute a bond conditioned for the faithful performance of its agreement to pay such damage as might result from its operation over the line of railroad. It was further provided that the contract should extend over a period of only one year instead of ten. The concluding paragraph is as follows:

"This contract shall be effective as of date February 20, 1919, and shall continue for a period of one year thereafter without further renewals, provided that party of the first part (the Director General and the St. Louis Southwestern Railway Company of Texas) may cancel the same by giving six months' written notice of such cancellation to party of the second part (the lumber company); and party of the second part may cancel same by giving thirty days written notice to party of the first part of its intention to cancel this contract. And provided further that this agreement of the Director General of Railroads shall not extend beyond the period of federal control of railroad, and, unless sooner terminated, shall, as to him, terminate at the end of such federal control."

This contract was, however, not executed by all of the parties till sometime in November, 1919. Immediately after the first written contract was executed, the lumber company demanded the right to operate its trains over the line of the railway company for the purpose of transporting logs from Pollock to its sawmill at Lufkin; but the Director General refused to grant that permission, and continued to do so until November, 1919, when the contract signed by Neff for the Director General had been executed. During the time intervening between the execution of the first contract on the 20th of February, 1919, up until the time the lumber company

was permitted to operate its logging trains over the line of railway as specified in the contracts, the Director General transported for the lumber company from Pollock to its mill at Lufkin 1,012 cars, for which he charged the lumber company the sum of $8.24, per car, aggregating $8,338.88. This amount was paid by the lumber company under protest to the Director General for the transportation above stated. This suit is to recover the difference between that sum and the amount the transportation would have cost the lumber company had it been permitted to operate its own trains in compliance with the terms of the written contract. It is agreed that, had such privilege been accorded, the lumber company would have paid out the sum of $4,367.67 less than the amount it did pay to the Director General for the services performed by him in transporting the logs and lumber of the lumber company. Upon that evidence, which was undisputed, the trial court rendered a judgment in favor of the lumber company against the Director General of Railroads for the sum of $4,367.-67. From that judgment the Director General alone has appealed.

The question of law presented in this appeal is, Did the Director General make a binding traffic agreement with the lumber company and afterwards break it? Two written instruments are relied upon as evidence of his contract. Each of these is complete within itself. They differ in some of their terms and in the time for which the traffic agreement was to continue. The first writing was signed by two of the parties to the agreement in February, but was never signed by the third, the railway company. The second was signed by all the parties in November following. It is conceded that the second contract was binding from the time it was actually executed in November, and there is no contention that it was thereafter violated by the Director General.

The appellee asserts two propositions in support of the judgment appealed from. The first is that the first contract was binding upon the Director General, even though it had not been signed by the railway company. The second proposition is that, if the first contract was not binding, the second contract contained stipulations which made it retroactive back to February; that the legal effect of those stipulations was to make the Director General liable for the damages sustained by the lumber company between February 20 and November, when the second contract was actually executed and delivered.

[1] Considering these propositions in the order above stated, the first question is, Was the February contract binding upon the Director General? It purported on its face to be a tripartite agreement. It contained stipulations which required the assent of all three of the parties mentioned in its pre-

amble. It covered a period which contemplated that it might extend beyond government control. Under the general rule adopted by courts, a contract of this kind is not binding upon any of the parties until all have executed, or accepted it. Before one of the parties can be called upon to perform the obligations assumed, all of the parties must be bound, or none of them will be bound. 9 Cyc. 299, 300; Campbell v .McFadin, 71 Tex. 28, 9 S. W. 139; Hess v. Lackey (Ind. Sup.) 132 N. E. 257. It is clear that, under the provisions of that contract, the lumber company could not have been held bound until the railway company had given its assent. The lumber company was contracting for privileges which the railway company only could grant. It may be true that the Director General, without the concurrence of the railway company, could conclude a traffic agreement covering the period of government control, but that is not what the parties undertook to do and what the lumber company had a right to demand should be done. Let us suppose that the railway company had refused to give its assent to the written agreement, could the lumber company still elect to be bound by it and demand that the Director General should perform his portion of the obligations during the period of government control? Let us assume, for the sake of argument, that the lumber company might have claimed that right; but that does not settle the question under consideration.

[2] There is another reason for saying that this contract was unenforceable. The lumber company did not in fact bind itself to accept the provisions of the contract and to operate its trains during any part of the period described. The agreement as written was strictly unilateral. It was no more than the concession of a privilege or an option to the lumber company allowing it, if it chose to do so, to operate its trains in the manner and for the price stated. It was not required to pay any consideration unless it did operate its trains. It could have refused .to avail itself of that privilege without incurring any liability for damages to the Director General or to the railway company. Contracts for options, or concessions of this character, to be enforceable, must rest upon a consideration paid or one to be paid, whether the option or concession is used or not, or upon some unconditional promise of the purchaser to be performed in the future. Johnson v. Breckenridge-Stephens Co. (Tex. Civ. App.) 241 S. W. 195; 6 R. C. L. 686, and cases cited in the notes. In this instance the lumber company paid nothing, and did not promise to pay anything except for the mileage it might thereafter use. We therefore conclude that this first contract was not binding upon the Director General. The fact that it was thereafter superseded by a second contract covering the same subject-matter and imposing materially different terms is conclusive evidence that the parties did not intend that it should be binding upon any of them

[3] The second proposition urged by the lumber company in support of the judgment is that the second contract was in its terms retroactive, and in legal effect made the Director General liable for the damages sustained by the lumber company between February 20 and November. That proposition is based upon the following language used in the second contract: "This contract shall be effective as of date February 20, 1919." The argument is made that this language rendered the Director General liable for what the lumber company lost by reason of not being permitted to enjoy the privilege of operating its own trains over the railroad under the terms stipulated. It is by no means certain that the Director General intended to bind himself to thus reimburse the lumber company for such a loss. If there had been no binding contract to permit the lumber company to use the railroad prior to November, the date when the second contract was executed, clearly there was no violation of any agreement for which damages could be claimed. If the Director General had not deprived the lumber company of any right which the lumber company might have legally claimed during that interval, the Director General was not responsible for any damages. No damages for the breach of a contract can arise till after the contract is made. If we construe this language as an assumption by the Director General of liability for that loss, then he was undertaking to do something to which he could not bind his government. We cannot assume that he so intended in the absence of stipulations which would bear no other construction. The Director General can be held responsible for only those damages resulting from his wrongful breach of an existing contract. He could not legally bind the government to pay the lumber company a sum of money which the government did not owe.

We are therefore of the opinion that the judgment should be reversed and judgment here rendered that the lumber company take nothing by its suit, and that it pay all costs both of this court and of the court below.