**The KRUPP ORGANIZATION, a Division of Measured Marketing Services, Inc., Appellant,**

v.

**BELIN COMMUNITIES, INC., et al., Appellees.**

**No. 17311.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

May 3, 1979.

Rehearing Denied June 7, 1979.

Butler, Binion, Rice, Cook & Knapp, Roger A. Rider, Houston, for appellant.

Reynolds, Allen & Cook, James R. Leahy, Houston, for appellees.

Before COLEMAN, C. J., and PEDEN and DOYLE, JJ.

PEDEN, Justice.

The Krupp Organization appeals from a take-nothing judgment after the non-jury trial of this suit based on breach of contract. Krupp contends that the final contract between the parties provided that Elkins Lake would pay for 250,000 multipart brochures to be made up and mailed by Krupp. Elkins Lake contends that the parties' agreement consisted of several writings and oral statements between their agents and required it to purchase only 50,000 brochures. Detailed findings of fact and conclusions of law were filed. Krupp alleges 1) that its second quotation (signed on January 21, 1974) became a valid contract, 2) that Elkins Lake breached it, 3) that Krupp is entitled to damages, and 4) that the trial court's significant findings were based solely on erroneously admitted parol evidence. By cross-point, Elkins Lake maintains Krupp was overpaid and that Elkins Lake is entitled to recover the overpayment. We reverse and render.

Krupp is a California Company specializing in creating, printing and mailing advertising brochures. Elkins Lake is the assumed name of Lakewood Hills, a joint venture that was managed by Belin Communities, Inc.

In September of 1973, Cullum J. Heard, Vice President of Marketing for Elkins Lake, signed a "Quotation from the Krupp Organization" presented by Robert Feinstock, a Krupp salesman, who initialed it. An additional signature space titled "Must Be Approved by a Krupp Organization Corporate Officer" was not signed. The quotation stated that 250,000 brochures would be printed and mailed at a cost of $250 per thousand, including postage. Designing of the brochures was begun.

A second "Quotation from the Krupp Organization" was signed on January 21, 1974, by Heard for Elkins Lake and initialed by Feinstock on the line entitled "Submitted for the Krupp Organization," but the line marked "Must Be Approved by a Krupp Organization Corporate Officer" was again left blank. Feinstock was not a corporate officer. The second quotation also provided for 250,000 brochures, but the cost was raised to $235 per thousand plus postage because Elkins Lake had added an extra item to the mailing. Along with the signed second quotation, Elkins Lake sent Krupp a check for $15,000 as initial payment, and Krupp began the printing and mailing of 50,000 brochures. Krupp sent an acknowledgement dated January 31, stating that 50,000 brochures would be sent out in the course of six mailings, and they would be completed on March 8. Feinstock testified that the decision to print and mail 50,000 pieces, at the rate of 10,000 per week, was made by Krupp, but he said it was made at Heard's request. On cross examination, he related that the 50,000 figure was picked by Heard and was mutually agreed upon by Heard and himself.

By letter dated May 17, 1974, Heard cancelled further orders by authorizing Feinstock to sell any unused materials ordered for the Elkins Lake brochures, and Krupp credited $9,614 to Elkins Lake's account for the unused paper stock, ink, and mailing lists. Krupp alleges that Elkins Lake still owes $17,506.00 plus an additional $605.86 for certain items outside the January 21, 1974 quotation.

Over Krupp's objections, the trial court admitted parol evidence concerning the agreements of the parties. Heard testified that Feinstock represented that neither of the quotations was intended to be a final agreement and that no quotation would be final and binding until approved by a corporate officer of Krupp. Further, that he and Feinstock agreed that a 50,000 unit sample mailing would be prepared and that if the resulting sales were satisfactory, the remaining 200,000 units would be printed and mailed out. He said Elkins Lake had had no prior business dealings with Krupp, so it was agreed that this sample mailing would allow Elkins Lake to see if Krupp's direct mail program would be effective.

Appellant's first ten points of error and its points twelve through sixteen each assert that there is no evidence to support certain of the trial judge's findings of fact because such findings were based solely on

parol evidence. We summarize the findings in question:

2) Feinstock (of Krupp) represented to Heard (of Elkins Lake) that the September 17, 1973, quotation (PX 3) would not be binding on Elkins Lake even if Heard signed it unless a Krupp corporate officer approved it;

3) Feinstock represented that he would not submit the quotation to a Krupp officer for approval until its terms had been finally agreed upon;

4) Heard signed the quotation (PX 3) in reliance on Feinstock's representations;

8) Neither Feinstock nor Heard intended the quotation (PX 3) to be a binding, final agreement;

9) Negotiations continued and on January 21, 1974, Feinstock tendered a second quotation (PX 7) to Heard;

10) Feinstock represented that it would not be binding on Elkins Lake unless approved by a Krupp corporate officer;

11) Feinstock also represented that he would not submit the second quotation to a Krupp officer for approval until the parties had agreed on final terms;

12) Heard signed the second quotation in reliance on such representations from Feinstock;

16) Neither Feinstock nor Heard intended the second quotation to be the final terms of an agreement;

19) Feinstock agreed for Krupp, before January 21, 1974, that the number of brochures would be 50,000;

22) Elkins Lake agreed to pay $235 per 1000 for the 50,000 units to be produced plus an additional amount because of the reduction in quantity from the proposed 250,000 to the agreed 50,000;

23) The parties agreed that part of such additional cost would be billed to Elkins Lake following each of six mailings to be used;

24) The reduction in quantity from 250,-000 to 50,000 was confirmed in writing by Krupp in its "acknowledgement" dated January 31, 1974 (DX 2);

27) The parties agreed that Elkins Lake would order no more brochures unless the agreed 50,000 units produced satisfactory results.

Section 2.201(a) of the Texas Business and Commerce Code states that except as otherwise provided in that section, a contract for the sale of goods for the price of $500 or more is not enforceable unless there is some sufficient writing and signed by the party against whom enforcement is sought. The writing must indicate that a contract of sale has been made by the parties and must specify a quantity. " 'Signed' includes any symbol executed or adopted by a party with a present intention to authenticate a writing." Sec. 1.201(39). Further, a contract which does not satisfy these requirements but which is valid in other respects is enforceable if the goods are to be specially manufactured and the seller has made a substantial beginning of their manufacture before notice of repudiation is received. Sec. 2.201(c)(1).

Section 2.202 of the Code provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of dealing or usage of trade (Section 1.205) or by course of performance (Section 2.208); and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The official commentary following this section of the Code states:

Purposes:

1. This section definitely rejects:

(a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon;

(b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used; and

(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.

2. Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.

3. Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms. If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.

█ In our case, Krupp's second quotation, the one on which it seeks to recover, met the basic requirements of Sec. 2.201(a); it was in writing and it was signed by Heard, an officer of Elkins Lake. There is, however, the signature space we have noticed labeled "Must Be Approved by a Krupp Organization Corporate Officer" that has not been signed or initialed. This omission gave the trial judge cause to question whether Krupp's second quotation, plaintiff's exhibit 7, was intended by the parties as a final expression of their agreement. The trial judge was entitled to consider the parties' course of dealing and of performance in resolving that question.

The second quotation (PX 7) included these provisions:

"Quantity 250,000

"When furnished with transparencies . . . Krupp's will provide, in addition to account management, the following services:

ART/COPY/CREATIVE

. . . rough and finished layouts.

LISTS

. . . special interest groups on magnetic tape.

PRINTING/BINDERY

(here followed a description of the weights of the papers, the sizes of the cards and envelopes and the number of colors of ink to be used in the seven pieces listed—with a note that all sizes are approximate)

. . . . .

INVESTMENT. $235/M

plus postage"

We have noted that Mr. Heard signed it for Elkins Lake on January 21. By letter dated the next day he forwarded to Krupp a check for $15,000 as "initial payment for direct mail program; printing, postage, etc." and said "Sorry for all the delays, but everything is moving now and I look forward to an exciting year."

█ When, some ten days later, on January 31, Krupp sent its "acknowledgement," it appears that the parties had reached an agreement. The acknowledgement is identified as "1278F Revised," "Continuation of Job 5765F," and states "Est. Quan. 50,000." It bears this message:

"Thank you for your order. This is a copy of a work order which we have entered for you. Please read it carefully. . . ." The work description includes details of printing, lithographing, computer work, cutting, folding, inserting and mailing. The mail schedule lists six dates on which a total of 50,000 units were to be stamped and mailed. Prices were not mentioned.

The testimony of Feinstock and Heard as to the number of units agreed upon is conflicting and the documentary evidence is not clear as to whether the parties had agreed to reduce the order to 50,000 units or had merely agreed to start performance of the contract by a first printing of 50,000 units. We think the trial judge was entitled to conclude from the documentary evidence that Krupp's second quotation (PX 7) was not intended by the parties as a final expression of their agreement as to the number of mailings and to admit parol evidence to clarify the parties' dealings. We have noted that Section 2.202 of the Texas Business and Commerce Code states that terms set forth in writing which are intended by the parties to be the final expression of the agreement may not be contradicted by evidence of a simultaneous oral agreement or by evidence of a prior agreement. However, the terms of the writing may be supplemented or explained if the court finds that the writing was not intended as a complete and exclusive statement of the terms of the agreement. "Term" is defined as "that portion of an agreement which relates to a particular matter." Sec. 1.201(42) Tex.Bus. & Comm.Code (1968). Section 2.202 of the Code allows the admission of only three types of parol evidence: that of course of dealing or usage of trade, evidence of course of performance, and evidence of consistent additional terms. Section 2.208(a) of the Code concerning course of performance states that "[w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." This section recognizes that the parties know best what they mean and that their actions under their agreement are the best indication of its meaning. Sec. 2.208, Comment 1 (1968).

There was introduced into evidence a Krupp invoice for 47,240 brochures, the number actually printed and mailed. This invoice outlined the mailing schedule and was backed up by individual invoices for each of them. Heard testified that Feinstock agreed to a sample mailing but cautioned Heard that a smaller printing run would cost more than the quoted price of $235 per thousand. According to Heard, the additional cost was $65 or $75 per thousand, and Feinstock was to invoice Elkins Lake for the difference in price between mailing out 50,000 and 250,000 brochures. The invoices admitted into evidence reflect this additional cost of $66.52 per thousand. The third mailing consisted of 2000 at $66.52 additional charge per thousand and 7196 at $71.52 additional cost per thousand. The remaining invoices each reflected an additional charge of $71.52 per thousand. These additional charges amounted to $3,318.60 plus postage, etc., for a total of $6,210.17. This course of performance was capable of being taken to substantiate Elkins Lake's contention that the only final agreement was for a sample mailing of 50,000 brochures.

Since parol evidence was admissible, the findings of the trial court that we have listed were supported by sufficient evidence.

The parties are in agreement that they contracted concerning cancellations: "Should customer cancel a work order, he will be liable for all costs (labor, material and lists, etc.) incurred to date of cancellation and for non-returnable supplies ordered for this job." While Elkins Lake does not characterize its conduct as cancellation of a work order for the remaining 200,000 mailings, its letter dated May 17, 1974, authorized Krupp "to sell any stock ordered for Elkins Lake and related material held by your organization. . . ."

Having held that the trial court did not err in admitting the parol evidence and in finding that the parties agreed to the 50,000 figure, we look to the testimony as to damages.

■ Under the trial court's findings, Krupp was entitled to recover under the contract on the basis of 50,000 units but not for loss of anticipated profit based on 250,000 units.

■ The parties stipulated in the trial court that "if the court finds a contract to be in existence, that attorney's fees are recoverable pursuant to that contract. That a reasonable attorney's fee is $3,500." The trial court's first conclusion of law is that a contract existed, but the evidence and the court's findings fail to show that Elkins Lake was indebted to Krupp, so Krupp cannot recover an attorney's fee.

The trial judge's findings concerning Krupp's expenses and payments by Elkins Lake were:

    25) Elkins Lake has paid Krupp $21,322.17;

    31) When Krupp received notice that no more brochures would be ordered, its costs incurred to date were $10,915.63.

The appellant's eighteenth and nineteenth points of error complain that there is no evidence to support finding 31 and that it is against the great weight of the evidence.

On December 27, 1973, Krupp had billed Elkins Lake for work done to that point. Feinstock testified that it covered the acquisition of necessary materials and included overhead and profit. A description of the work done was set forth in the bill in detail, but the charges were not itemized.

    Krupp's figures were:

| Charges billed to December 27 | | |
|---|---|---|
|    (principally materials) | $ | 42,120 |
| Elkins Lake paid on January 21 | – | 15,000 |
| | $ | 27,120 |
| Credit for unused paper, inks, etc. | – | 9,614 |
|    Demanded by Krupp, June 4 | $ | 17,506 |
| Due on a transaction not in the | | |
|    contract | + | 605.86 |
|         Balance due | $ | 18,111.86 |

Feinstock explained that Elkins·Lake should pay under the contract for 250,000 units at a rate of $168 per thousand, a total of $42,120. The $168 figure was reached by excluding from the rate stated in the second quotation ($235 per thousand plus postage) the cost of those papers and inks that would not be needed in view of the reduction in quantity. Not excluded from the $168 figure was an item of $75 per thousand called by Krupp "account management." Feinstock testified that such term covers "conceptualizing, copying, rewriting" plus overhead and profit.

Under the trial court's findings that the parties contracted for 50,000 brochures at $235 per thousand and that Elkins Lake would also pay certain other agreed charges, we need not consider whether the evidence supports its finding as to Krupp's costs to the date when it learned that no more brochures would be ordered. Under those contract findings and the evidence of damages, the only items chargeable to Elkins Lake were:

| | | |
|---|---|---|
| 47,240 brochures at $235/thousand | $ | 11,101.40 |
| Agreed additional charges | | 6,210.17 |
| Unused brochures sent to Elkins Lake | | 462.00 |
| McGraw Hill list sent to Elkins Lake | | 255.86 |
|    Obligations of Elkins Lake | $ | 18,029.43 |

It is uncontroverted that Elkins Lake paid Krupp $21,322.17, so under the trial court's findings and conclusions, Elkins Lake is entitled to recover the difference, $3,292.72. We need not consider the value of the supplies used by Krupp or the value of the unused supplies that it sold.

The appellant contends that Section 2.708(b) of the Code, not Section 2.708(a) is applicable here. The two parts of that section provide:

    § 2.708. Seller's Damages for Non-Acceptance or Repudiation

    (a) Subject to Subsection (b) and to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract

price together with any incidental damages provided in this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach.

(b) If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 2.710), due allowance for costs reasonably incurred and due credit for payment or proceeds of resale.

We overrule the appellant's points of error 21 and 22, which are directed to the trial court's conclusions of law that Elkins Lake performed its obligations under the contract and has not breached it, so it necessarily follows that neither part of Section 2.708 is applicable.

We have examined each of the appellant's points of error and find that none of them presents reversible error.

We sustain the appellees' cross point to the extent that it is to recover the overpayment of $3,292.74.

The judgment of the trial court is reversed, and judgment is rendered in favor of the appellees in the amount of $3,292.74.