NO. 07-03-0395-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



AUGUST 16, 2004



______________________________




DERRICK T. PAYTON, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 98-427618; HONORABLE BRADLEY S. UNDERWOOD, JUDGE



_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

MEMORANDUM OPINION


 Derrick T. Payton appeals a judgment entered on August 14, 2003, revoking his
community supervision and sentencing him to ten years in the Texas Department of
Criminal Justice, Institutional Division. Appellant was convicted in 1998, pursuant to a plea
bargain, of the offense of delivery of a controlled substance. He was sentenced to ten
years confinement in the Texas Department of Criminal Justice, Institutional Division,
probated for ten years under terms and conditions of community supervision. He was
ordered to pay restitution in the sum of $820, court costs and fees. 

 The State filed an application to revoke appellant's community supervision in
December 2000, alleging he had tested positive for marijuana in September 1999, and in
February and April of 2000, and alleging he failed to report, failed to attend a drug
offender's program, and failed to pay restitution, court costs and fees. An agreed motion to
modify the terms and conditions of his community supervision was filed by the parties and
on May 30, 2002, the court entered an order in accordance with that motion. Additional
conditions were imposed and appellant was sentenced to 100 days in the Lubbock County
Jail. Upon release he was to be placed on electronic monitoring supervision. 

 On October 24th, 2002, a second application to revoke appellant's community
supervision was filed, alleging that he had committed the offense of evading arrest. This
application was amended on April 1, 2003, and again on April 10, 2003. The second
amended application alleged he had violated the terms and conditions of his community
supervision because he failed to pay court costs, fees and restitution, failed to abstain from
the use or possession of alcoholic beverages and drugs, failed to follow the conditions of
electronic monitoring supervision, and evaded arrest.

 A hearing was held on the second amended application on July 9, 2003. The second
amended application alleged violations occurring from April of 1999 up to the date of the
hearing. The court, however, considered only violations that occurred subsequent to the
May 2002 modification order. (1) The conditions of community supervision appellant was
alleged to have violated during this time period were:


 Commit no offense against the laws of this or any other State or the 
United States;
 Avoid injurious or vicious habits; and


 c) Maintain total abstinence from the use or possession of
alcoholic beverages and any narcotics or dangerous drugs not
prescribed by a physician . . .


At the conclusion of the hearing, the court found appellant had violated the terms of his
community supervision in that:


 On or about the 23rd day of October 2002, appellant committed the
offense of evading arrest, and


 B. Appellant tested positive for marijuana on October 21, 2002 and
signed a confession on October 28, 2002 admitting to smoking
marijuana and drinking two beers on October 8, 2002.


The court revoked appellant's community supervision and sentenced him to ten years
confinement in the TDCJ. 

 Appellant presents the following two issues for our review, both challenging the trial
court's finding that appellant committed the violation of evading arrest: 1) whether appellant
had knowledge that he was being detained by an officer, and 2) whether appellant was held
for a lawful detention. The issue on appeal from an order revoking community supervision is whether the
trial court abused its discretion. See Jackson v. State, 915 S.W.2d 104, 106 (Tex. App.--San Antonio 1996, no pet.). In a probation revocation proceeding, the State must show by
a preponderance of the evidence that the probationer has violated at least one condition
of probation as alleged in the revocation petition. Cobb v. State, 851 S.W.2d 871, 873
(Tex.Crim.App. 1993). If the State fails to meet that requirement, the trial court abuses its
discretion in revoking probation. Cardona v. State, 665 S.W.2d 492, 493-94 (Tex.Crim.App.
1984). 


 When more than one violation of probationary conditions is found by the trial court,
the order revoking probation will be upheld if the evidence supports any of the violations
found by the court. See Alexander v. State, 879 S.W.2d 338, 340 (Tex. App.--Houston [14th
Dist.] 1994, pet. ref'd), cert. denied, 514 U.S. 1127, 115 S. Ct. 1999, 131 L. Ed. 2d 1000
(1995) (citing Hendley v. State, 783 S.W.2d 750, 752 (Tex.App.--Houston [1st Dist.] 1990,
no pet.)). 

 In a revocation proceeding, the trial court is the sole trier of fact and, as such,
determines the credibility of witnesses and the weight to be given their testimony. Moore v.
State, 11 S.W.3d 495, 498 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In determining
whether the evidence is sufficient to sustain a probation revocation, we view the evidence
in a light most favorable to the trial court's ruling. Jones v. State, 589 S.W.2d 419, 421
(Tex.Crim.App. 1979); Torres v. State, 103 S.W.3d 623, 625 (Tex.App.-San Antonio 2003,
no pet.).

 Appellant's brief focuses on one of the two violations found by the trial court, the
offense of evading arrest, arguing that appellant did not have knowledge he was being
detained and that appellant was not held under a lawful detention. (2) While the State's initial
application to revoke probation was based solely upon the offense of evading arrest, the
State later amended the application alleging additional violations. It is not necessary for us
to discuss either of appellant's issues because he has failed to address the other violations
found by the court which provided sufficient grounds for revocation of appellant's community
supervision. See Moore v. State, 605 S.W.2d 924, 926 (Tex.Crim.App. 1980).

 The trial court found that appellant violated the conditions of his community
supervision by failing to maintain total abstinence from narcotics and alcohol. The trial court
heard testimony that appellant had tested positive for marijuana on October 21, 2002, and
confessed on October 28, 2002, to consuming alcohol and smoking marijuana on October
8, 2002. At the hearing, appellant admitted that the allegations of drug and alcohol use were
true. As a part of the modification of the terms of his community supervision, in May of
2002, appellant was sentenced to 100 days of "shock time" in the county jail. Appellant
testified that immediately upon being released from the jail facility, he violated his terms of
community supervision by smoking marijuana. That testimony and the evidence appellant
had used alcohol and marijuana in October of 2002 was sufficient for the court to find
appellant committed new violations of the terms of his community supervision after the April
2002 modification order, by using drugs and alcohol. 

 Appellant's two issues fail to address these violations. Because one violation of the
terms and conditions of community supervision provides sufficient grounds to revoke
appellant's community supervision, we find the court did not abuse its discretion by revoking
appellant's community supervision and imposing the original sentence of ten years
imprisonment. The order of the trial court is affirmed. 


 James T. Campbell

 Justice



Do not publish. 



1. The second motion to revoke alleged some of the violations that were previously
alleged in the State's first motion to revoke. Due process mandates a new determination
that a probationer has breached the conditions of probation after he has been returned to
probation (or that there is newly discovered evidence of a previous violation which was not
known at the time of the first revocation hearing). See Matheson v. State, 694 S.W.2d 661,
662 (Tex.App.-Fort Worth 1985, pet. granted) judgment reformed, 719 S.W.2d 204
(Tex.Crim.App. 1986). The appellate record reflects, however, that here the revocation of
probation was based only on violations that occurred subsequent to the May 2002
modification order. See Jenkins v. State, 641 S.W.2d 917, 918 (Tex.Crim.App. 1982). 
2. At the hearing, Kerri Sawyer, appellant's probation officer, testified that even though
appellant had tested positive for marijuana on October 21, 2002, she would not have filed
a violation report had it not been for the allegation that appellant had evaded arrest. 
Appellant argues that because this violation caused the State to file the motion to revoke,
if appellant did not commit the violation of evading arrest, there would be no basis to
revoke his community supervision. Appellant cites no authority supporting this argument,
and we find it to be without merit.


n Locked="false" Priority="63" SemiHidden="false"
 UnhideWhenUsed="false" Name="Medium Shading 1 Accent 3"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 









                                                            NO. 07-08-0344-CV

 

                                                   IN
THE COURT OF APPEALS

 

                                       FOR
THE SEVENTH DISTRICT OF TEXAS

 

                                                                 AT
AMARILLO

 

                                                                     PANEL
D 

 

                                                              MARCH
12, 2010

 

                                            ______________________________

 

 

                                              ASHLEIGH M. SMITH, APPELLANT

 

                                                                            V.

 

                                    ALDERSON ENTERPRISES, L.P., APPELLEE

 

                                         _________________________________

 

                       FROM
THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

 

                         NO.
2007-539,137; HONORABLE RUBEN REYES, JUDGE

 

                                           _______________________________

 

 

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

 

 

                                                      MEMORANDUM
OPINION

 

 








Appellant, Ashleigh M. Smith, brought
a declaratory judgment, breach of contract, and tort action against Appellee,
Alderson Enterprises, L.P.  Following a jury determination that Smith
entered into a legally enforceable contract with Alderson to purchase a new
car, the trial court found that Smith breached the contract and awarded damages
to Alderson.  In a single point of error,
Smith asserts the trial court erred by upholding the jury determination and
denying Smith=s motion for judgment notwithstanding the
verdict.  We affirm. 

                                                                  Background

In 2004, Smith purchased a Lexus RX330
from Alderson, a car dealership located in Lubbock, Texas.  In April 2007, she brought the RX330 to
Alderson for repairs and began shopping for a replacement car.  On April 5, she asked an Alderson salesman to
put some numbers together on a Mercedes ML350 and, two days later, she returned
with her husband to look at the Mercedes ML350 and a Lexus IS250.  On April 12, Smith met with Jimmy Myatt, the
Alderson car salesman who originally sold her the RX330, and after test driving
three vehicles, she asked Myatt to put some numbers together on the Lexus
IS250.  








After further negotiations, Myatt and
Smith agreed on a price for the IS250 and the trade-in value of her RX330.  After determining the cash payoff to ABC Bank
on her trade-in, Myatt determined the net purchase price and filled out a buyer=s order form.  With a cash down payment of ten thousand
dollars, under the ATotal Payments@ heading, three financing scenarios
were described.  One scenario calculated
payments of $661.28 per month for thirty-six months without assigning an
interest rate.[1]  The two remaining scenarios calculated
monthly payments for forty-eight and sixty months at 6.9% interest.

Once Myatt obtained Smith=s agreement to the figures on the
handwritten buyer=s order form, he took the form to Glen
Garnett, Alderson=s new car sales manager.  After Garnett initialed the order (AOK by GG@), Myatt introduced Smith to Sharla
Snuggs, Alderson=s financial services manager.  Myatt testified he had sold the IS250 to
Smith before he introduced her to Snuggs.[2]

 
         While Smith was in Snuggs=s office, the handwritten buyer=s order form was typed.   All of
the numbers on the typewritten form were the same with the exception that the
forty-eight and sixty month financing options at 6.9% were eliminated and
financing at 6.1% for thirty-six months, with payments of $661.28 per month,
was typed on the form.  The form also
indicated a cash payment of ten thousand dollars and provided that Toyota Motor
Credit Corporation would finance the balance due.  Smith signed the typewritten form. 

            Smith also signed a multitude of
other sale documents while she was in Snuggs=s office.  One document was a power of attorney
unconditionally permitting Alderson to transfer ownership of the RX330 to
another buyer.  Smith signed as the
RX330's Aseller@ and Alderson signed as Abuyer.@[3] 
In addition to the power of attorney, Smith also signed an odometer
disclosure statement for the RX330, as Atransferor@; an arbitration agreement as Abuyer@; an application to register and title
the IS250 as Apurchaser@ with Toyota Motor Credit Corporation
as the Afirst lien holder@; a credit application for purchase of
the IS250 as Aapplicant@; a Motor Vehicle Retail Installment
Sales Contract as Abuyer;@ and a privacy notice to protect
against Alderson=s disclosure of nonpublic information
as Acustomer.@ 


Snuggs understood Smith wanted the
vehicle titled to reflect her husband as a co-buyer; therefore, she gave Smith
a number of documents for Dr. Smith=s signature and asked Smith to mail
them back to Alderson when they were completed.[4]  Subsequently, Smith took delivery of the
IS250.  Alderson affixed a Ared tag@ on the car that indicated Alderson
had sold the IS250 to Smith as ABuyer.@[5] 
Thereafter, Smith transferred her personal items from the RX330 to the
IS250, and drove home to Clovis, New Mexico.








After her arrival, Dr. Smith reviewed
the paperwork for the car.  He contacted
Snuggs and asked her to redo the paperwork so the IS250 could be titled to ASmith Chiropractic Center, P.A.@ with him as personal guarantor.  Snuggs re-drafted the paperwork and sent the
package to Dr. Smith by Federal Express.[6]

Less than one week later, on April 18,
the Smiths were involved in an accident while driving the IS250.[7]  The next day, Smith drove the damaged IS250
to Alderson and attempted to return the vehicle, insisting that she was merely
test driving the vehicle and had not purchased it.  Prior to her arrival, Smith had not informed
anyone at the dealership of the accident. 

Myatt looked at the damaged IS250 and
attempted to advise Smith on the process for submitting an insurance claim.  At Myatt=s behest, Paul Scott, Alderson=s general manager, became involved.  Scott suggested that Smith have an estimate
of damages prepared by a nearby body shop. 
Smith drove the car to the body shop where they estimated the damages could
be repaired for five thousand dollars. Thereafter, Smith returned to the
dealership, left the IS250, and departed.

Later, Dr. Smith called Scott.  Scott informed Dr. Smith that his wife had
purchased the IS250; however, he did offer to assist with filing an insurance
claim and trade-in of the IS250 on another vehicle.  Dr. Smith informed Scott that he was calling
his attorney.  








In May, Alderson sold the RX330 and
paid off the remaining balance of Smith=s loan to ABC Bank.  Snuggs testified Alderson fulfilled its end
of the bargain, i.e., sold Smith the IS250 for the agreed upon price of $36,000,
allowed Smith the agreed upon trade-in value of $21,000 on her trade-in,
delivered the IS250 to Smith, and paid off the balance of the debt owed to ABC
Bank by Smith on the RX330.

Also in May, Smith filed her amended
petition for declaratory judgment, conversion, breach of fiduciary duty, and
permanent injunctive relief.  In addition
to tort and contractual remedies, Smith sought a declaration from the trial
court that no binding contract to purchase the IS250 existed between Smith and
Alderson.  Alderson counterclaimed for
damages due to breach of contract. 

Following a four day trial, the jury
found that ASmith and Alderson Enterprises, L.P.,
enter[ed] into an agreement for the purchase of a 2007
Lexus Model IS250 on April 12, 2007.@ 
In its judgment issued July 29, 2008, the trial court found that Smith
breached the contract of sale and awarded damages to Alderson.  After Smith=s motion for judgment notwithstanding
the verdict was denied by the trial court, this appeal followed.           






Discussion








Smith asserts the trial court erred,
as a matter of law, by upholding the jury=s determination that a legally
enforceable contract existed between Smith and Alderson, and denying Smith=s motion for judgment notwithstanding
the verdict.  Smith asserts no contract
existed because her husband did not review and sign the sale documentation or
approve the car.  Smith also asserts the
typewritten buyer=s order, signed by her, was not a
contract document because a term varied from the prior handwritten buyer=s order and the typewritten buyer=s order was not signed by the
dealership.  Alderson asserts Smith
agreed to buy the car, signed all the necessary documentation, and accepted
delivery.

I.          Standard
of Review

We review declaratory judgments under
the same standards as other judgments and decrees.  Lidawi v. Progressive County Mut. Ins. Co.,
112 S.W.3d 725, 730 (Tex.App.BHouston [14th Dist.] 2003,
no pet.).  We look to the procedure used
to resolve the issue at trial to determine the standard of review on
appeal.  Id.  








In reviewing rulings on motions for
judgment notwithstanding the verdict, appellate courts apply the no-evidence
standard.  See City of Keller v.
Wilson, 168 S.W.3d 802, 823 (Tex. 2005); McGuire, Craddock, Strother
& Hale, P.C. v. Transcontinental Realty Investors, Inc., 251 S.W.3d
890, 894 (Tex.App.BDallas 2008, pet. denied).  The court reviews the evidence and must
credit the favorable evidence if reasonable jurors would and disregard contrary
evidence unless reasonable jurors would not. 
City of Keller, 168 S.W.3d at 826-27.  A challenge to the legal sufficiency of the
evidence will be sustained when, among other things, the evidence offered to
establish a vital fact does not exceed a scintilla.  Kroger Texas Ltd. P=ship v. Suberu, 216 S.W.3d 788, 793 (Tex.
2006).  That is, the evidence offered to
establish a vital fact must not be Aso weak as to do no more than create a
mere surmise or suspicion@ that the fact exists.  Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 601 (Tex. 2004).  Therefore, the
focus of our inquiry is whether the jury's determination that a legally
enforceable contract existed between Smith and Alderson is supported by legally
sufficient evidence.

Further, when parties offer
conflicting testimony, particularly on an issue such as intent, the jury has
the exclusive responsibility to determine the credibility of the witnesses, the
weight to be given their testimony; Serv. Corp. Int=l v. Aragon, 268 S.W.3d 112, 118 (Tex.App.BEastland 2008, pet. denied); Brown
v. Taylor, 210 S.W.3d 648, 672-73 (Tex.App.BHouston [1st Dist.] 2006,
no pet.), and resolve conflicts and inconsistencies in the testimony of any one
witness as well as in the testimony of different witnesses.  Banks v. Columbia Hosp. at Medical City
Dallas Subsidiary, L.P., 233 S.W.3d 64, 67-68 (Tex.App.BDallas 2007, pet. denied).  Where the jury believes one party=s version of the events underlying the
action over another, we cannot substitute our judgment or opinion for that of
the jury.  Lofton v. Tex. Brine Corp.,
720 S.W.2d 804, 805 (Tex. 1986).  See
Carousel=s Creamery, L.L.C. v. Marble Slab
Creamery, Inc., 134
S.W.3d 385, 404 (Tex.App.BHouston [1st Dist.] 2004,
pet. dism=d by agr.).  In other words, the jury's determination of
the intent of the parties, or the lack thereof, is entitled to almost total deference.  

II.         Contract

In its simplest terms, a contract is established when proven by a
preponderance of the evidence that an offer is accepted, accompanied by
consideration. See Domingo v. Mitchell, 257 S.W.3d 34,
39-40 (Tex.App.BAmarillo 2008, pet. denied).  To determine whether there was an offer and
acceptance, and therefore a "meeting of the minds," courts use an
objective standard, concerning what the parties did and said, not their
subjective states of mind.  See Komet v. Graves, 40 S.W.3d 596, 601
(Tex.App.--San Antonio 2001, no pet.). 








AMeeting of the minds@ describes the mutual understanding
and assent to the agreement regarding the subject matter and the essential
terms of the contract.  Weynand v.
Weynand, 990 S.W.2d 843, 846 (Tex.App.BDallas 1999, pet. denied).  Where this element is contested, as here, the
determination of the existence of a contract becomes a question of fact.  Hallmark v. Hand, 885 S.W.2d 471,
476-77 (Tex.App.BEl Paso 1996, writ denied).  

Further, parties may agree to the
material terms of a contract but leave other matters open for later
negotiation; it is only when an essential term is left open for future
negotiation that no binding contract exists. 
Kelly v. Rio Grande Computerland Group, 128 S.W.3d 759, 766
(Tex.App.BEl Paso 2004, no pet.); Komet v.
Graves, 40 S.W.3d at  602. 
Written contracts may also consist of multiple documents; City of
Houston v. Clear Channel Outdoor, Inc., 233 S.W.3d 441, 445 (Tex.App.BHouston [14th Dist.] 2007,
no pet.), and writings may be considered together if they pertain to the same
transaction.  City of Keller, 168 S.W.2d at 811.  See Jones v. Kelley, 614 S.W.2d 95, 98
(Tex. 1981) (separate instruments executed at the same time, for the same
purpose, and in the course of the same transaction are to be considered as one
instrument and construed together).  In
addition, if one party signs a contract, the other may accept by his or her
acts, conduct, or acquiescence in the terms of the contract.  DeClaire v. G. & B. McIntosh Family Ltd. P'ship,
260 S.W.3d 34, 44
(Tex.App.--Houston [1st Dist.] 2008, no pet.) (collected cases
cited therein).








 
         Here, there is more than a
scintilla of evidence supporting the jury=s determination that Smith entered
into a contract to purchase the Lexus IS250 from Alderson.  When Myatt presented Smith with the handwritten
buyer=s order initialed by his sales
manager, Alderson made an offer to sell the IS250 to Smith.  The offer contained the essential financial
elements of the agreement, the sales price, the trade-in value of her RX330,
the down payment, and three optional financing arrangements.  Smith accepted Alderson=s offer on terms identical to those
offered in the handwritten buyer=s order when she signed the typewritten
buyer=s order.[8]  The sole difference being that, in her
acceptance of the typewritten terms, Smith chose between the three methods of
financing offered in the handwritten buyer=s order.[9]


That a contract formed was also
evidenced by the parties' actions after the type-written buyer=s order was executed by Smith.  Smith executed a power of attorney
unconditionally authorizing Alderson to sell her trade-in vehicle and transfer
ownership.  Alderson delivered the new
IS250 to Smith.  Smith accepted the new
car, removed her possessions from the RX330, placed them in the IS250 and drove
to New Mexico with a temporary license tag indicating she had bought the car
from Alderson.

Relying upon Gilbert v. Texas and portions of Snuggs=s testimony, Smith asserts there was no
contract to sell the IS250 because Dr. Smith did not sign the sale and
financing documents.[10]  Snuggs's testimony,
however, is equally consistent with the notion that, if Dr. Smith did not sign
the sales contract or financing statement, he would not be shown on the title
as a co-buyer.  Snuggs also testified
that Smith agreed to buy the IS250 and the financing agreement was sent to her
husband to co-sign.  She further
testified that the documents were not sent to Dr. Smith Ato review but to sign and return back.@ 
Scott testified the buyer=s order is the actual sales agreement,
not the financing agreement.  He further
testified Alderson considered the sale of the car to Smith a Adone deal@ whether or not Dr. Smith signed off
on the sales agreement or financing agreement. 
Myatt=s testimony regarding whether Smith
bought the car is compatible with the testimony of Snuggs and Scott.[11]

Smith accepted Alderson=s offer and undertook to perform the
contract as it was prepared, executed, and delivered.  See Centennial Royalty Company v. Byrd
& Foster Drilling, Inc., 464 S.W.2d 420, 422-23 (Tex.Civ.App.BEl Paso 1971, no writ).  See also Krupp Organization v. Belin
Communities, Inc., 582 S.W.2d 514, 518-19 (Tex.Civ.App.BHouston [1st Dist.] 1979,
writ ref=d n.r.e.).  That her husband, Dr. Smith, was listed as a
buyer on upper portions of the buyer=s order form does not prevent a
binding contract to purchase the IS250 from being formed as between Smith and
Alderson unless the parties agreed that Dr. Smith's signature was a
prerequisite, or condition precedent, to the formation of a binding contract.  

III.        Condition
Precedent

Smith asserts there was no meeting of
the minds on the sale of the new car because she Aunderstood@ there could be no contract to
purchase the car until her husband had signed the paperwork and Awas otherwise satisfied with the car.@[12] 
In essence, Smith contends her husband=s signature and satisfaction were
conditions precedent to the existence of a contract for the purchase of the new
car.

A condition precedent may be a
condition to the formation of a contract. 
Hohenberg Bros. Co. v. George E. Gibbons, 537 S.W.2d 1, 3 (Tex.
1976).  See Progressive County Mut.
Ins. Co. v. Trevino, 202 S.W.3d 811, 814-15 (Tex.App.BSan Antonio 2006, pet. denied).  In order to make performance specifically
conditional, a term such as Aif,@ Aprovided that,@ Aon condition that,@ or some similar phrase of conditional
language must normally be included in the contract.  Criswell v. European Crossroads Shopping
Center, Ltd., 792 S.W.2d 945, 948 (Tex. 1990).  Although there is no requirement that such
phrases be utilized, their absence is probative of an intention that a promise
be made rather than a condition imposed. 
Hohenberg, 537 S.W.2d at 3. 
See Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc., 201
S.W.3d 272, 281 (Tex.App.BHouston [14th Dist.] 2006,
no pet.).  And, because of their
harshness, conditions precedent are not favored in the law.  PAJ, Inc. v. Hanover Ins. Co., 243
S.W.3d 630, 636 (Tex. 2008); Hirshfeld, 201 S.W.3d at 281.








Here, there is no express contractual
provision creating any condition precedent asserted by Smith.[13]  Nevertheless, where one party testifies that
a contract was conditioned upon the happening of an event and the other party
denies the existence of such a condition,[14]
as we have here, the evidence raises an issue of fact to be decided by the
jury.  Turboff v. Gertner, Aron &
Ledet Investments, 763 S.W.2d 827, 830 (Tex.App.BHouston [14th Dist. 1988,
writ denied) (conflicting testimony on issue whether party=s signature was a condition precedent
to a contract raises a fact issue); Perry, 377 S.W.2d at 771.[15]  Although Smith testified it was her Aunderstanding@ or Aassumption@ 
there would be no contract until her husband signed the documents or
expressed his satisfaction with the car, there is no evidence of record
indicating she voiced her Aunderstanding@ to anyone or that anyone at Alderson
agreed with this proposition.  Rather,
Myatt, Snuggs, and Scott all testified Smith
unconditionally purchased the car.  Thus,
even if Smith=s testimony created a conflict in the
record, the jury=s verdict on such matters is generally
regarded as conclusive.  Montgomery
Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 511-12
(1947). 

In addition to asserting that a sales
agreement could not be premised on the buyer=s orders, Smith also asserts the AMotor Vehicle Retail Installment Sales
Contract@ was not a valid sales agreement
between Smith and Alderson because the document was not executed by either Dr.
Smith or Alderson.  Having already
determined that the buyer's order form is sufficient indicia of an agreement
between Smith and Alderson, we need not decide the enforceability of the MVRISC
as further evidence of that agreement.  The
jury was asked simply to determine whether ASmith and Alderson Enterprises, L.P.,
enter[ed] into an agreement for the purchase of a 2007 Lexus Model IS250 on
April 12, 2007,@ and we find there is more than a
scintilla of evidence to support their determination.[16]


Although Smith also asserts there was
no contract because she did not read the documents before she signed them, she
does not claim she was tricked or defrauded. 
She testified that neither Myatt nor Snuggs were Ahigh-pressure@ or pressured her into a sale.  Further, she spent nearly four hours with the
documents in Snuggs=s office while speaking with her
husband on the telephone.  As such, she
is charged with knowledge of all the terms of the documents she signed.  In re Prudential Ins. Co. of America,
148 S.W.3d 124, 134 (Tex. 2004).  See
Wee Tots Pediatrics, P.A. v. Morohunfola, 268
S.W.3d 784, 791 (Tex.App.BFort Worth 2008, no pet.).  A[P]arties to a contract have an
obligation to protect themselves by reading what they sign.@ 
Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex. 1963).

Because there is more than a scintilla
of evidence to support the jury=s finding that Smith and Alderson did
enter into an agreement for the sale of the IS250, Smith=s single point of error is overruled.








                                                                   Conclusion

The trial court=s judgment is affirmed.

 

Patrick
A. Pirtle

      Justice











[1]Although the interest rate was not
stated, it was calculable from the figures provided.  The subsequently signed typewritten buyer's
order form and Motor Vehicle Installment Sales Contract both reflect that a
6.1% APR was applied to arrive at 36 monthly payments of $661.28.

 





[2]Myatt=s testimony was
corroborated by Snuggs=s testimony that she
does not negotiate deals.  According to
Snuggs, "They don=t come into my office
unless they have agreed to buy the car and they want the car.  My job is just to formalize the process."

 





[3]The RX330 was titled in Smith=s name only.  

 





[4]The following
documents were marked for Dr. Smith=s signature: the Motor Vehicle Retail
Installment Sales Contract as Aco-buyer@ and attached notice
to co-signer; the typewritten buyer=s order form; arbitration agreement as Abuyer@; application for
vehicle title and registration as A2nd registered owner@; credit application
as Aco-applicant@; and privacy notice
as Aco-customer.@  





[5]Myatt testified a Ablack tag@ is placed on a
vehicle being test driven because the Ablack tag@ indicates Alderson owns the vehicle.  Paul Scott, Alderson=s general manager,
testified that Alderson=s dispensation of Ared tags@ to salesmen is
regulated by the dealership and the State. 
Scott testified that, A[i]n
the history of Alderson=s dealership, there
has never been a time when they affixed a red tag to a vehicle for a test
drive.@  





[6]Neither Smith nor Dr.
Smith ever executed these papers.





[7]The police report
listed the owner of the IS250 as ASmith Chiro.@





[8]That the type-written
buyer=s offer disclosed an
interest rate at 6.1% is immaterial because the payment term, thirty-six
months, and monthly payment, $661.28, remained the same as that disclosed in
the handwritten buyer order.





[9]Pursuant to the terms
of the buyer=s order, Alderson
retained the option of cancelling the contract if the dealership could not
obtain approval of the order=s terms from a bank
or finance company.  While Smith would
treat this contract provision as a condition precedent, the provision is a
condition subsequent, i.e., a condition referring to a future event,
upon the happening of which the obligation becomes no longer binding upon the
other party, if he or she chooses to avail themselves of the condition.  Abraham Inv. Co. v. Payne Ranch, Inc.,
968 S.W.2d 518, 524 (Tex.App.BAmarillo 1998, pet.
denied); Rincones v. Windberg, 705 S.W.2d 846, 848 (Tex.App.BAustin 1986, no
writ).  See Black=s Law Dictionary 312
(8th ed. 2004).  Further,
although, as Smith suggests, the buyer=s order is an offer, its express language
provides that the order Abecomes an agreement
with dealer when it is accepted by dealer or its authorized representative.@    





[10]Gilbert v. Texas, 218 S.W.2d 906 (Tex.Civ.App.Beaumont 1949, writ refd
n.r.e.) is of no assistance to Smith.  In Gilbert, the court found there was
no meeting of the minds and, hence, no contract where the alleged contracting
document was a letter indicating that a certain party had been accepted as a
purchaser of the property but also indicated the property was being offered to
another prospective purchaser and expressed an intent to hold further
negotiations.  Id.
at 941-42.





[11]Even if, as Smith
suggests, Snuggs=s testimony did
conflict with the jury=s finding and/or the
testimony of her co-workers, we must defer to the jury=s determinations
regarding the credibility of witnesses and the weight to be given their
testimony.  Golden Eagle Archery, Inc.
v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  A court of appeals cannot Apass upon a witnesses= credibility or
substitute its judgment for that of the jury, even if the evidence would
clearly support a different result.@  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex.), cert. denied,
525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).





[12]Smith repeatedly
testified at trial that she Aunderstood@ she was signing the
paperwork to take the car for a test drive to New Mexico where her husband
could look at the car.  Myatt and Snuggs
testified Smith did not tell them she was taking the car to New Mexico for a
test drive.  Further, the jury=s verdict indicates
they relied on the testimony of Myatt and Snuggs while disregarding Smith=s testimony.  It is not within the province of this court
to interfere with the jury=s resolution of conflicts
in the evidence or pass on the weight or credibility of the witness=s testimony.  See Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792, 797 (1951).    





[13]Thus, neither In Re Bunzl USA, Inc., 155 S.W.3d 202
(Tex.App.BEl Paso 2004, no
pet.) nor Davis v. Phillips A. Ryan Lumber Co., 248 S.W. 448
(Tex.Civ.App.BTexarkana 1923, writ
dism=d w.o.j.) are of any
assistance to Smith.  In Bunzl,
the court held that the parties did not intend to be bound until the parties
signed a contract that contained a blank signature block and an express
provision requiring all modifications and amendments to the contract to be in
writing and signed by the parties to be effective.  Id. at 211.  Here, Alderson signed a handwritten buyer=s order with the same
terms as that subsequently signed by Smith. 
Moreover, there was no blank signature line for Dr. Smith and the
buyer=s order did not
contain an express provision similar to that in Bunzl.  In Davis, aside from other
distinguishing factors, the contract at issue there contained express
stipulations requiring the assent of all three parties to a contract that was
strictly unilateral.  Id.
at 450.  





[14]AIt is generally held
that a conditional delivery of a writing may be shown
by parol testimony if the conditional delivery establishes a condition
precedent rather than a condition subsequent.@  Perry v. Little, 377
S.W.2d 765, 769 (Tex.Civ.App.BDallas 1964, writ ref=d n.r.e.).





[15]See
also RSM Production Corporation v. Vintage Petroleum, Inc., No. 14-07-00563-CV,
2008 WL 4657735, *4-6 (Tex.App.BHouston [14th Dist.] 2008, no
pet.) (not designated for publication).  





[16]Because the jury=s charge was not
challenged or excepted to and there were no special
issues suggested by either party, Awe must conclude that all controversial
issues of fact were correctly submitted to the jury, and the judgment of the
trial court forecloses all other issues that should have been submitted.@  Tarlton v. Trezevant & Cochran, 165
S.W.2d 514, 516 (Tex.Civ.App.BDallas 1942, writ ref=d w.o.m.).  See also Tex. R. Civ. P. 272 (AAll objections not so
presented shall be considered as waived.@); Tex. R. Civ. P. 273 (proposed jury
instructions Ashall be prepared and
presented to the court and submitted to opposing counsel for examination and
objection@).