Richard T. KELLY, Appellant,

v.

**RIO GRANDE COMPUTERLAND GROUP, Elio Castanuela, and Manuel Marrufo, Appellees.**

No. 08–02–00304–CV.

Court of Appeals of Texas, El Paso.

Feb. 19, 2004.

Robert E. Hedicke, El Paso, for appellant.

Steven L. Hughes, Mounce, Green, Myers, Safi & Galatzan, El Paso, for appellees.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

Richard T. Kelly appeals summary judgment in favor of defendants Rio Grande Computerland Group (RGCG), Elio Castanuela, and Manuel Marrufo. Kelly's petition to the trial court claimed that RGCG, Castanuela, and Marrufo are liable for breach of contract, promissory estoppel, equitable estoppel, common law fraud, and statutory fraud. He seeks reinstatement as president and director of the corporation, as well as actual and exemplary damages, attorney's fees, and access to the books and records of RGCG. He also seeks declaratory judgment that he was denied his proper station as president and director of RGCG. The trial court entered two orders of summary judgment in favor of all defendants and denied summary judgment to the plaintiff. We affirm in part and reverse in part.

## Facts

In early October 1993, Richard Kelly, Judd Singer, and Sam Davis were the sole shareholders in Rio Grande Computerland Group. Kelly held the majority of shares. Kelly was the president of the corporation from 1980 through 1994. In 1994, the shareholders listed RGCG for sale with a business broker, priced at $800,000. Singer explained the first contacts with Castanuela and Marrufo in his deposition:

> They approached us at first with a discussion of purchasing the company. It later evolved ... into a discussion of taking a piece of the—a business, investing in the business, if you will, helping us to grow the business to the next level, which was what our goals were and reasoning behind bringing in additional investors.

On September 24, 1993, Castanuela and Marrufo sent a letter of intent offering to purchase a 60 percent share of the company.

The document was entitled "Letter of Intent to Acquire Shares of Rio Grande Computerland Group, Inc." It began "Dear Rick," and was signed by Castanuela and Marrufo. Its stated purpose was to outline the terms and conditions of the agreement with respect to the purchase by Elio Castanuela ("Castanuela") and Manuel Marrufo ("Marrufo") of sixty percent (60%) of the authorized, issued and outstanding shares of the voting shares of Rio Grande Computerland Group, Inc. ("RGCG"). Among its provisions were:

1. **Purchase of Stock.** RGCG will issue to Castanuela and Marrufo, in equal shares, that number of shares that is necessary so that following such issuance of shares Castanuela and Marrufo will own sixty percent (60%) of the authorized, issued and outstanding voting shares of all classes of RGCG. The total consideration to be paid by Castanuela and Marrufo for such shares shall be Three Hundred Thousand Dollars ($300,000) which will be payable immediately upon issuance of the shares.

2. **Election of Directors and Officers.** Following the issuance of such shares, Castanuela, Marrufo and Rick Kelly ("Kelly") will enter into a shareholders agreement whereby they each agree to vote their respective shares to elect Castanuela as a member of the board of directors and chairman of the board of directors and to elect Marrufo and Kelly as members of the board of directors. Further, Castanuela, Marrufo and Kelly shall agree to

elect Kelly as president of the corporation, Marrufo as executive vice-president and chief financial officer, and to elect Castanuela as senior vice-president of sales.

3. **Responsibilities.** Kelly will continue as president of RGCG and will carry out the duties associated with that office. Judd Singer ("Singer") will be continued as vice-president of the service sales with responsibility to increase the service revenue by several orders of magnitude over current levels. . . . Employment agreements will be prepared and entered into by and between RGCG and each of Kelly, Singer, Marrufo, and Castanuela, providing for officer compensation commensurate with the corporation's operating budget, duties and responsibilities, employee benefits, and such other reasonable provisions regarding employment contracts, to which the parties mutually agree.

. . .

6. **Inter–Company Receivables.** The existing inter-company receivables now on the books of RGCG which involve amounts due from Computerland/Juarez, Kelly, and any other receivables from officers or directors of RGCG, will be written off and charged against retained earnings after giving due regard to the tax effect to each of the parties as a result of such write off.

7. **Operating Budget.** Kelly, Castanuela and Marrufo will agree on an operating budget as soon as practicable following the issuance of the new shares.

. . .

11. **Buy–Sell Agreement.** As soon as possible, Kelly, Castanuela and Marrufo and Singer will enter into a Shareholder Buy–Sell Agreement.

12. **Conditions Precedent to Purchase.** . . . Mrs. Erin E. Kelly must give spousal consent to the satisfaction of Castanuela and Marrufo, or a Decree of Final Divorce dissolving the marriage of Kelly and Mrs. Erin E. Kelly must have been entered by a court of competent jurisdiction whereby Mrs. Erin E. Kelly has no right, title or interest in the transactions contemplated by this agreement.

The letter was explicitly made subject to "approval of counsel for all parties and to the preparation and execution of a final binding agreement prepared by counsel for all parties." Kelly, majority shareholder and president of RGCG, together with shareholder Judd Singer, signed the document as "Agreed and Accepted." At the time, Kelly and Singer had been meeting with other potential buyers and specifically wanted a letter of intent, which they felt was a legal document that would allow us to go forward with negotiations.

Many provisions contained in the Letter of Intent were ignored in the Purchase Agreement of October 25, 1993. Those omitted included the shareholders' agreement, the buy-sell agreement, and the employment agreement. Marrufo testified that the purchase agreement, the shareholders' agreement, and the buy-sell agreement were to be executed separately; they never were. Kelly likewise understood that the Purchase Agreement encompassed only the stock transfer aspects of their agreement, and that usually employment contracts and buy-sell agreements would not be included in a Purchase Agreement. Castanuela contended the Purchase Agreement covers whatever he agreed to when he purchased the shares of

RGCG. The purchase agreement contained a merger clause:

> *Entire Agreement.* This Agreement merges all previous negotiations between the parties hereto and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement. No alterations, modifications or change of this Agreement shall be valid except by a like instrument in writing and signed by each party to this Agreement.

According to Kelly, at some point prior to executing the Purchase Agreement the parties orally agreed that he was to be paid $6,700 a month, with a salary of $80,000 a year and a draw against profits of $1,300 a month. Kelly claims this arrangement was to last at least one year. At the time that Kelly was fired, that is what he was being paid. On a business trip to Juarez, Mexico, after the signing of the Purchase Agreement, Kelly and Castanuela also discussed the execution of the employment agreement and the buy-sell agreement. On November 16, after the execution of the purchase agreement, an agenda for a management meeting notated that Marrufo was to work on buy-sell agreements and the employment agreement. When asked when he decided not to have employment agreements, Marrufo replied, "Well, it just didn't happen. Nobody ... asked for one, and nobody got one."

Marrufo could not recall any discussion between signing the Letter of Intent and the Purchase Agreement in which he and Kelly agreed that there would be no employment agreement, buy-sell agreement, or shareholder agreement. Moreover, Marrufo contended that the inter-company receivables provisions of the Letter of Intent was not meant to be a forgiveness of the debts, just a write-off for accounting purposes because collectibility was ques-

tionable. He explained that actual forgiveness of the debt would require them to give Kelly a 1099 form for his taxes. That was not done.

The closing documents and minutes of the meeting in which Marrufo became a director are missing. Kelly was fired as president of RGCG and removed from the board of directors on February 21, 1994. Castanuela has been executive vice-president and chairman of the board of directors of RGCG since October of 1993. Marrufo has been director, shareholder, and president of RGCG since October of 1993.

### Kelly's global issue challenging summary judgment

Kelly's sole issue contends the trial court erred in granting summary judgment because genuine issues of material fact exist.

### Standard of Review

In reviewing the trial court's grant of summary judgment, we give no deference to the trial court's decision. Summary judgment is proper only when there is no genuine issue of material fact and movant is entitled to judgment as a matter of law. *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex. 2001); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985); *Wyatt v. Furr's Supermarkets, Inc.,* 908 S.W.2d 266, 268 (Tex.App.-El Paso 1995, writ denied); Tex.R. Civ. P. 166a(c). In determining whether a disputed material fact issue exists, we take as true evidence favorable to the nonmovant, and every reasonable inference must be indulged in favor of the nonmovant. *Shah,* 67 S.W.3d at 842 (citing *American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997)); *Wyatt,* 908 S.W.2d at 268 (citing *Nixon,* 690 S.W.2d at 548–49). If the movant submits summary judgment con-

clusively disproving at least one element of the plaintiff's case, then summary judgment should be granted. *Wyatt,* 908 S.W.2d at 268 (citing *Rayos v. Chrysler Credit Corp.,* 683 S.W.2d 546, 547 (Tex. App.-El Paso 1985, no writ)). Our review of the judgment is limited to the issues presented to the trial court in the motion for summary judgment. *Sebesta v. Kent Electronics Corp.,* 886 S.W.2d 459, 460 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (citing TEX.R. CIV. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 676 (Tex.1979); *Dickey v. Jansen,* 731 S.W.2d 581, 583 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.)). A summary judgment is not entitled to the same deference given a judgment following a trial on the merits. *Id.*

### The Letter of Intent and Purchase Agreement

Central to the parties' dispute is whether the Letter of Intent was enforceable after the Purchase Agreement was signed. Kelly contends the Purchase Agreement memorializes only the first subject agreed to amongst the parties, and that numerous other agreements are contained in the Letter of Intent. Castanuela and Marrufo characterize the Letter of Intent as an agreement to agree that was not binding after the Purchase Agreement was signed. Throughout this litigation, Castanuela and Marrufo insist that "[t]here is only one written contract between Marrufo and Kelly, Castanuela and Kelly, and [RGCG] and Kelly; namely, the [Purchase] Agreement."

The terms in the Letter of Intent constituted a much better bargain for Kelly than those in the Purchase Agreement. The letter offered him a shareholders' agreement, continued his position as president of the company and board member, wrote off his debts to the company, and included

a buy-sell agreement. In exchange, Kelly agreed to continue as the president, settle his wife's interests in the company, and most importantly, he and Singer agreed to consider Castanuela and Marrufo over competing potential buyers.

#### i. legally binding contract

▆ We begin with the question of whether the Letter of Intent was a legally binding contract. Whether an agreement is legally enforceable is a question of law. *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 814 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dism'd,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). To be enforceable, the parties must have agreed on essential terms. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). However, parties may agree on some of the contractual terms, understanding them to be an agreement, and leave other contract terms to be made later. *Id.* It is only when an essential term is left open for future negotiation that there is nothing more than an unenforceable agreement to agree. *Oakrock Exploration Co. v. Killam,* 87 S.W.3d 685, 690 (Tex.App.-San Antonio 2002, pet. denied) (citing *T.O. Stanley Boot Co.,* 847 S.W.2d at 221). A party cannot accept an offer to form a contract unless its terms are reasonably certain. *Id.* (citing *Texas Oil Co. v. Tenneco, Inc.,* 917 S.W.2d 826, 830 (Tex.App.-Houston [14th Dist.] 1994), *rev'd on other grounds sub nom., Morgan Stanley & Co., Inc. v. Texas Oil Co.,* 958 S.W.2d 178 (Tex.1997)). Texas courts favor validating transactions rather than voiding them, but courts may not create a contract where none exists and they generally may not add, alter, or eliminate essential terms. *Id.* In construing an agreement, the courts may consider evidence of circumstances surrounding its execution. *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 622 (Tex.

App.-San Antonio 1996, writ denied) (citing *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981)).

■■■ Under some circumstances, a binding contract may be formed if the parties agree on the material terms, even though they leave open other provisions for later negotiation. *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 19 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (citing *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 555 (Tex.1972)). Similarly, a letter of intent may be binding even though it refers to the drafting of a future, more formal agreement. *Id.* (citing *Foreca, S.A. v. GRD Dev. Co., Inc.,* 758 S.W.2d 744, 746 (Tex.1988)). As letters of intent may be binding, authorities are quick to warn parties of the risks involved with their use. *Id.* A party not wishing to be prematurely bound by a letter agreement is advised to include a provision clearly stating that the letter is nonbinding, as such negations of liability have been held to be effective. *Id.* (quoting E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.8b, at 193 (1990)). No such provision was included here.

■■■ Three elements determine whether a contract for sale has been formed. The terms must include: (1) the thing sold, which is the object of the contract; (2) the consideration or price to be paid for the thing sold; and (3) the consent of the parties to exchange the thing for the price. *John Wood Group,* 26 S.W.3d at 20 (citing *Byrd v. State,* 54 Tex.Crim. 170, 114 S.W. 135, 136 (1908)). Here, all three elements creating a contract for sale were contained in the Letter of Intent.

■■■ The Letter of Intent set out that Kelly, Castanuela, and Marrufo would enter into a shareholders' agreement by which they would each become directors and work together in certain capacities within the corporations. Kelly was to maintain his position as president of the corporation. The situation in which Kelly had been president for the prior fourteen years could provide terms by which that position would be carried out. The Letter is silent as to the period for which Kelly was to remain as president of RGCG, (prompting the appellees to rely on the Statute of Frauds), and no period is required in the establishment of a shareholders' agreement. That could have been established within a year. Likewise, buy-sell agreements and the promise of employment agreements, the execution of which was relied upon by Kelly in considering what Castanuela and Marrufo were offering, were presented in the plan. Kelly accepted that offer and, at the very least, a fact finder could find he was entitled to a good faith effort at its implementation.

In sustaining Kelly's issue on breach of contract, we rely on the Letter of Intent's lack of cautionary language limiting enforceability; the inclusion of numerous terms favorable to Kelly that were not included in the Purchase Agreement; and the evidence from both sides of the lawsuit that the employment agreement, buy-sell agreement, shareholder's agreement and receivables agreement were not intended to be included in the contract for purchase of stock. We conclude that a fact question exists as to whether the Letter of Intent was a contract whose terms beyond the Purchase Agreement remained enforceable, if not superceded by language in the subsequent document.

*ii. merger language*

■■■ Castanuela and Marrufo rely on merger language of the Purchase Agreement in arguing that the Purchase Agreement completely supercedes the Letter of Intent. Nevertheless, both Marrufo and Castanuela agreed that when the Let-

ter of Intent was signed, the employment agreement, the purchase agreement, the buy-sell agreement, and the shareholders' agreement were all intended to be set out in separate documents. No discussions between the signing of the Letter of Intent and the Purchase Agreement removed these topics from the mix. Moreover, we cannot agree that the merger language in the Purchase Agreement conclusively terminates all promises set forth in the Letter of Intent. Rather, the Purchase Agreement is limited by its own language:

> 8.10 *Entire Agreement.* This Agreement merges all previous negotiations between the parties hereto and constitutes the entire agreement and understanding between the parties with respect to *the subject matter of this Agreement.* No alterations, modifications or change of this Agreement shall be valid except by a like instrument in writing and signed by each party to this Agreement. (Emphasis added).

Thus, we must determine the scope of the subject matter of this Agreement. In that regard, our primary concern in construing any written contract is to ascertain the true intent of the parties as expressed in the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994)); *Lake Charles Harbor & Terminal Dist. v. Bd. of Trs. of the Galveston Wharves*, 62 S.W.3d 237, 242–43 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A written contract is not ambiguous if it is so worded that it can be given a definite or certain legal meaning. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520 (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)). Parol evidence is not admissible for the purpose of creating an ambiguity. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520; *Lake Charles Harbor & Terminal Dist.*, 62 S.W.3d at 243.

Where contract language is subject to two or more reasonable interpretations, however, it is ambiguous. *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520. Whether a contract is ambiguous is a question of law for the courts to decide by looking at the contract as a whole in light of the circumstances present at the time the contract was executed. *Id.* Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extrinsic evidence to determine the true meaning of the instrument. *Id.* (citing *Sun Oil Co.*, 626 S.W.2d at 732; *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980)).

An ambiguity in a contract may be either patent or latent. *Id.* Whereas a patent ambiguity is evident on the face of the contract, a latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears. *Id.* If a latent ambiguity arises, parol evidence is admissible for the purpose of ascertaining the parties' true intent as expressed in the agreement. *Id.*

Here, Kelly urges the term "the subject matter of this Agreement" can reasonably be found to be referring only to the purchase of stock as set forth in the Purchase Agreement's paragraph one. Castanuela and Marrufo, in contrast, claim the phrase refers to all agreements between the parties. We cannot say that either parties' interpretation is beyond reason, and thus a latent ambiguity has been exposed within the merger clause. We therefore look at any extrinsic evidence available to determine the parties' intent.

Before one contract is merged into another, the last contract must be between the *same* parties as the first,

must embrace the *same* subject matter, and must have been so intended by the parties. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898–99 (Tex.App.-Fort Worth 1997, writ denied). We note initially that none of the personal benefits to Kelly listed in the Letter of Intent were included in the Purchase Agreement. The broader range of subjects discussed in the Letter of Intent makes it reasonable that the Purchase Agreement was only one of a number of contracts to follow the initial agreement of the parties. Castanuela and Marrufo insist on numerous occasions that they were not officers or shareholders of RGCG at the time the Letter of Intent was signed.[1] Although this contention is helpful to the company, it also supports the contention that they entered it as individuals and thus were individually responsible for fulfilling its terms.

Thus, we conclude there is a fact question as to whether the Purchase Agreement was only the first in a series of agreements to be executed by the parties as memorialized in the Letter of Intent. We further conclude that the documents in this case were not so clearly merged as to warrant a summary judgment on that ground. Notably, the purchase agreement contains all benefits flowing to RGCG, Castanuela, and Marrufo contained in the Letter of Intent; it contains none of the benefits that were to flow to Kelly. For these reasons, summary judgment with respect to Kelly's claim for breach of contract against Castanuela, Marrufo and RGCG was in error, and that portion of Kelly's issue on appeal is sustained.

### iii. promissory estoppel

■ In light of our conclusion that the Purchase Agreement does not contain conclusive language merging all earlier agreements, we believe summary judgment based on promissory estoppel was also improper. Although normally a defensive theory, a promisee may have a cause of action for relying upon an otherwise unenforceable promise. *MCN Energy Enterprises, Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 774 (Tex.App.-Fort Worth 2003, review denied) (citing *Wheeler v. White*, 398 S.W.2d 93, 96–97 (Tex.1965)). The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his or her detriment. *Id.* (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983)).

■ Castanuela and Marrufo offered benefits to Kelly in the Letter of Intent, and he presented evidence that he relied on these in rejecting other potential purchasers. Selling controlling interest in the company to Castanuela and Marrufo could be found to be foreseeable reliance on the representations made in the Letter of Intent. Summary judgment was not appropriate on promissory estoppel with regard to the individuals Castanuela and Marrufo. That portion of Kelly's issue on appeal is sustained.

### iv. equitable estoppel

■ Unlike promissory estoppel, equitable estoppel does not lend itself to an offensive posture. Finding no exception to the use of equitable estoppel as a defensive theory only, we follow our sister courts in refusing to recognize this as a distinct cause of action separate from promissory estoppel or fraud. *See, e.g., Watson v. Nortex Wholesale Nursery, Inc.*, 830 S.W.2d 747, 751 (Tex.App.-Tyler 1992, writ denied); *Crowder v. Tri–C Resources, Inc.*,

---

**1.** RGCG was a party to the Letter of Intent through Kelly's agreement as president, and thus there is a fact question as to whether it assumed obligations that were later breached.

821 S.W.2d 393, 397 (Tex.App.-Houston [1st Dist.] 1991, no pet.). Summary judgment as to the cause of action for equitable estoppel is affirmed.

### Fraud

Kelly notes that he is claiming against the individual defendants, not RGCG, for fraud. We next turn to these claims against Marrufo and Castanuela.

### i. common law fraud

In order to establish a prima facie case for fraud, a plaintiff must establish the following elements: (1) a material representation was made; (2) that was false; (3) when made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) it was made with the intent that the other party should act upon it; (5) reliance; and (6) injury. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001) (citing *Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998)). A promise to do an act in the future is actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa*, 960 S.W.2d at 48. Mere failure to perform a contract is not evidence of fraud. *Id.; Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex.1992). However, that an agreement was not fulfilled may be considered along with other facts to establish intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). Since intent to defraud is not susceptible to direct proof, it is commonly shown by circumstantial evidence. *Id.* Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.* The party's intent at the time the representation was made is the legal determinor, and it may be inferred from subsequent acts. *Id.* at 434. Intent is a fact question that is uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *Id.*

Castanuela and Marrufo rely heavily on the fact that their representations to Kelly did not involve representation of past or then-existing fact; instead they involved promises of future performance. From this they conclude that the false representation basis for fraud does not exist as a matter of law. However, as we have just set out, a promise to act in the future is actionable if made with no intention of performing at the time the promise is made. They do not address this formulation of fraud.

After examining the summary judgment record, we conclude that Kelly presented evidence that could support a finding of intent to defraud. The Letter of Intent contains a number of offers by Marrufo and Castanuela, accepted by Kelly, that were only to occur after the purchase of shares. These included the promises that Kelly would join the board of directors and maintain his position as president of RGCG. Kelly was never made a director and was terminated as president within five months of the purchase of the company. No agreement beyond the purchase of stock was ever honored. If a trier of fact concludes this was a misrepresentation made to entice Kelly with no intention of performance, they could in turn find fraud. Summary judgment on the common law fraud cause of action was error.

Kelly's issue on appeal challenging summary judgment on common law fraud against Castanuela and Marrufo is sustained. Any fraud claim against the corporation is affirmed.

### ii. statutory fraud

Kelly has also claimed against Castanuela and Marrufo for statutory fraud under the Texas Business and Commerce Code section 27.01, which provides:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

 (1) false representation of a past or existing material fact, then the false representation is

 (A) made to a person for the purpose of inducing that person to enter into a contract; and

 (B) relied on by that person in entering into that contract; or

 (2) false promise to do an act, when the false promise is

 (A) material;

 (B) made with the intention of not fulfilling it;

 (C) made to a person for the purpose of inducing that person to enter into a contract; and

 (D) relied on by that person in entering into that contract.

TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 2002). Castanuela and Marrufo contend Kelly does not have standing under this statute, claiming (without any citation to authority) that only a seller or purchaser of stock can enforce section 27.01. In our reading of the statute's plain language, we do not see that the law is so exclusive. *See Manley v. State,* 774 S.W.2d 334, 338 (Tex. App.-Austin 1989, pet. ref'd) (citing *Lewis v. Davis,* 145 Tex. 468, 474, 199 S.W.2d 146, 149 (1947)); TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 2002). We will therefore employ the general formula used in determining whether Kelly has standing.

 In general, standing requires that there (a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446–47 (Tex. 1993) (citing *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955)). We conclude that under the classic analysis, Kelly does have standing to proceed under section 27.01. The appellees have failed to provide authority dictating otherwise. Thus, we sustain that portion of Kelly's issue on appeal challenging the trial court's ruling of statutory fraud under section 27.01.

### iii conclusion with respect to claims of fraud

Summary judgment with respect to the corporation RGCG is affirmed as to all fraud causes of action. Summary judgment on the causes of action for common law fraud and statutory fraud under TEX. BUS. & COM.CODE ANN. § 27.01 is reversed against Castanuela and Marrufo.

### Corporate Action

 Finally, Kelly claims that he is entitled to pursue his claim for declaratory relief that he should have become a director and president of the corporation after the sale. In that regard, he claims that Castanuela called the February 21, 1994 meeting without appropriate notice. Ten years have elapsed during which Castanuela and Marrufo have elected themselves to RGCG's board of directors and appointed Marrufo president of RGCG. Any declaration of Kelly's rightful position in the company ten years ago cannot help resolve any active controversy now. The point is moot; summary judgment with respect to the request for declaratory judgment is affirmed.

### Conclusion

We affirm summary judgment for the corporation RGCG on promissory estoppel,

equitable estoppel, fraud, statutory fraud, and declaratory judgment that Kelly is the president and director of RGCG. We reverse summary judgment on the breach of contract claim against RGCG.

We affirm summary judgment for the individuals Castanuela and Marrufo on equitable estoppel and declaratory judgment. We reverse summary judgment for them with regard to breach of contract, promissory estoppel, fraud, and statutory fraud. The case is remanded for further proceedings consistent with this opinion.