COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





ISAIAH LEVON QUIROZ, A MINOR,
BY AND THROUGH DEBRA QUIROZ,
AS PARENT AND NEXT FRIEND,

                                    Appellant,

v.

COVENANT HEALTH SYSTEM, A
TEXAS CORPORATION, LUBBOCK
METHODIST HOSPITAL, A TEXAS
CORPORATION, A&D MEDICAL
CENTER, L.L.C., A LIMITED
LIABILITY COMPANY, and 
DAVID WILLIAM DAVISON, M.D.,

                                    Appellees. 

§
 
§
 
§
 
§
 
§

§

 §

 §

 §

 §


No. 08-05-00196-CV

Appeal from
143rd District Court

of Ward County, Texas

(TC # 03-05-20478-CVW)




 

 

 





O P I N I O N

            This is another tragic birth asphyxia case. Following a jury trial, the trial court entered a take
nothing judgment in favor of Covenant Heath System, A&D Medical Center, L.L.C. and Dr. David
Davison, M.D.


 Debra Quiroz, as parent and next friend of her son Isaiah Levon Quiroz, filed a
medical malpractice suit alleging the negligence of Covenant and Dr. Davison proximately caused
her son’s devastating and permanent brain injuries.


 Quiroz challenges the factual sufficiency of the
evidence to support the jury’s verdict as well as several evidentiary rulings. For the reasons that
follow, we affirm.
FACTUAL SUMMARY
            Isaiah was born in Ward Memorial Hospital on August 8, 1998. The hospital is a small
county-owed facility in Monahans, Texas. Dr. Davison, the treating physician, attended Quiroz
throughout her prenatal course without any problems. Isaiah was born by emergency Cesarean
section with the umbilical cord wrapped tightly around his neck. Isaiah’s skin was blue, he was not
breathing, his heart rate was questionable, and his body was floppy. According to the medical
record, he suffered from “hypoxic ischemic encephalopathy” and has cerebral palsy. Although Isaiah
is expected to live into his seventies, he will never live independently or hold a job. He is not
expected to walk on his own and his ability to communicate is severely limited.
Hospital Management Contract
            Quiroz alleged that Covenant’s hospital manager had been negligent in operating the hospital
and had contributed to Isaiah’s injuries. The hospital is owned by Ward County and operates under
the control of a hospital board of directors. The board is made up of members of the community,
many of whom are farmers, ranchers, and local business people. In early 1998, the county
considered closing the facility due to severe financial problems. After negotiating with several
potential candidates, the hospital board of directors entered into a management agreement
with Covenant on May 26, 1998. Covenant and the hospital were operating under this agreement
seventy-four days later when Isaiah was born.
Fetal Heart Monitoring
            Our discussion of the events surrounding Isaiah’s birth requires a basic understanding of fetal
heart monitoring and the interpretation of monitor strips. A fetal heart montitoring machine is a
mechanical device which, when attached to a laboring mother’s abdomen, records both uterine
contractions and the baby’s heart rate. The two readings are produced simultaneously so that the
physician can track how the baby’s heart rate responds to the increased stress of labor. The uterus
contracts during labor, putting pressure on the umbilical cord. Even in a normal labor pattern, the
increased pressure causes the baby’s heart rate to drop during contractions because there is less blood
and oxygen moving through the cord from the placenta. According to expert testimony, fetal
montitoring is the best way to evaluate the status of the baby as labor progresses. 
            The monitor’s measurements are recorded on the monitor strip as continuous lines which rise
and fall according to the baby’s heart rate and uterine pressure. The monitor strip is divided into two
parts. The top line measures the baby’s heart rate. The bottom line, printed simultaneously,
measures the pressure created by contractions.
            The normal heart rate for a full term baby is between 110 and 160 beats per minute. A fetal
heart rate in the normal range is called “reassuring.” When the baby’s heart rate drops below the
normal range it is referred to as “nonreassuring.” The longer and more frequently the heart rate
drops, the more there is cause for concern. Changes in the baby’s heart rate produce a “squiggly
line” on the monitor strip, which is referred to as variability. The key to a normal monitor strip is
that heart rate changes mirror the pressure of the contraction. The baby’s heart rate should be at its
lowest when the pressure of the contraction peaks; then, as the contraction subsides, the heart rate
should recover.
            The baby’s heart rate can have both short-term and long-term variability. Short-term
variability refers to the beat-to-beat changes in the heart rate. Long-term variability measures the
number of large oscillations on the monitor strip in one minute. Long term variables are measured
in relation to a baseline which is simply the average heart rate over a ten minute period without a
contraction. An acceleration is a fifteen beat increase above the base line that lasts for at least fifteen
seconds. Accelerations are positive news for the patient because they indicate there is plenty of
oxygen flowing through the placenta. Concern develops when there is a variable deceleration and
the heart rate is slow to return to baseline. Because the goal is for the variables to match the
contractions, a slow return to baseline indicates the baby is under stress and having trouble
compensating for a lack of oxygen even as the contraction ends. Variable decelerations are usually
associated with umbilical cord compression of some kind.
            A late deceleration begins after the contraction starts. The low point of the deceleration
occurs after the height of the contraction. This is called uteroplacental insufficiency. The amount
of blood traveling through the placenta is insufficient to give the baby’s heart enough oxygen to
recover properly from the stress of the contraction. Without enough blood passing through the
umbilical cord from the placenta, the baby develops hypoxia, a decrease of oxygen. The decreased
blood flow is called “ischemia.”
            When the heart rate monitor shows signs of cord compression, the standard of care requires
intrauterine resuscitation to relieve the pressure on the cord and restore blood flow. Methods to
relieve cord pressure include repositioning the mother on her side or into the “Trendelenburg
position,” where her feet are higher than her head; pushing the baby’s head back up into the birth
canal; increasing fluids; and administering oxygen.
Labor and Delivery
Presentation Until 7:50 a.m.
            Quiroz presented at the hospital shortly after 2:45 a.m. on August 8, 1998. The fetal monitor
machine began recording at 2:45 a.m., and the next couple of hours were relatively uneventful. She
received an epidural for pain at 5:10 a.m.
            At 6:40 a.m., the monitor strip showed a series of three or four contractions without full
uterine relaxation between, as well as late decelerations with slow returns. The baby was beginning
to experience some stress but his body was able to compensate. From 7 a.m. until 7:15 a.m., there
were additional long contractions without relaxation. The monitor recorded a late deceleration and
a variable where the heart rate dropped down to 90 and was slow to return to the baseline. The
return to baseline indicated again that although the baby was stressed, he was still compensating after
the contractions.
            Dr. Davison arrived at 7:15 and reviewed the chart and monitor strip. From 7:20 until 7:35,
the decelerations became more frequent but were still not indicative of an emergency. Dr. Davison
ordered the surgical scrub nurse to be called in to prepare for a C-section if needed.


 The on-site
nurses tried to relieve stress on the baby by repositioning Quiroz on her sides, administering oxygen,
and stimulating the baby’s heart rate though scalp massage.
            Quiroz began pushing at 7:30. The monitor strip showed variable decelerations with each
push, another indication of cord compression. Quiroz pushed for ten minutes and although the
deceleration became more and more severe, the baby’s heart rate continued to climb back to the
baseline. The pattern repeated itself several times with moderate variability when the baby
experienced compensatory tachycardia. His heart accelerated back to and above the baseline, which
is an indication of hypoxia and severe stress.
7:50 a.m. Until Delivery
            At approximately 7:50 a.m., the baby stopped descending through the birth canal and was
in serious trouble. The scrub nurse clocked in at 8 a.m. Dr. Davison testified that he could not
perform the C-section safely without the scrub nurse to assist him. Without a surgical option,
Dr. Davison attempted to deliver Isaiah vaginally with the help of a vacuum extractor called the
“Mity-vac.” The device is designed to work as an alternative to forceps. The Mity-vac is made of
a cup which attaches to the baby’s head through light suction. A pump increases the suction during
a contraction, allowing the physician to pull the baby through the pelvis. At the end of the
contraction, the suction releases and the process starts again for another pull as the next contraction
begins.
            Dr. Davison applied the Mity-vac between 7:50 and 8:10, over the course of six contractions. 
He testified that on each of the first five pulls, he felt movement and believed Isaiah would be
delivered any second. On the last pull, there was no movement and Davison ordered a C-section. 
As Quiroz was prepped for the move to the surgical unit, the baby’s heart rate dropped dramatically
and variability disappeared.
            Whether Isaiah was delivered at 8:27a.m. or 8:39 a.m. is disputed.


 There are several
notations in the medical records indicating that Isaiah was delivered at 8:27 a.m. There is also a
notation on the fetal monitor strip that Quiroz was moved from the labor and delivery room to the
operating room at the same time.


 According to the surgical record, Quiroz arrived in the operating
room at 8:17; ten minutes before the monitor strip says she left labor and delivery. To complicate
matters further, hospital staff members testified that in an emergency situation, there is no one person
dedicated to charting the patient’s progress and procedures. Much of the medical record was created
after Isaiah was delivered and stabilized. 
            Dr. Davison testified that he made the decision to perform a C-section at 8:10 a.m. and the
staff immediately began moving Quiroz to the operating room. Quiroz herself testified that once
Dr. Davison made the decision, the staff “scrambled” to move her to surgery. 
Resuscitation and Diagnosis
            Isaiah was delivered by emergency C-section with the umbilical cord wrapped tightly around
his neck. Dr. Davison handed him to nurses Carlson and Collins to begin resuscitation. They
immediately evaluated Isaiah for an APGAR score.


 At one minute, Isaiah’s APGAR score was one. 
His skin was blue, he had little to no muscle tone, and he was not breathing. The only point the staff
recorded related to his heart rate, which was below sixty when the first measurement was taken. 
Most babies are born with an APGAR score of nine.
            Carlson headed the resuscitation effort while Collins focused specifically on Isaiah’s
respiratory effort. Over the next few minutes, Isaiah was intubated and bagged to push oxygen into
his lungs, and he was given chest compressions to stimulate his heart rate. Isaiah’s second APGAR
score was two, indicating the only change in condition was that his heart rate was over 100. His ten
minute APGAR score was only four. Isaiah was slowly improving but remained severely depressed. 
The final APGAR score at fifteen minutes was six.
            Once Isaiah’s condition was stable, he was transferred to the NICU at Medical Center
Hospital where he spent almost a month. The physicians diagnosed Isaiah as having suffered
hypoxic ischemic encephalopathy sometime during or directly after birth. Hypoxic ischemic
encephalopathy is a brain injury caused by a lack of oxygen and blood flow. 
Condition and Prognosis
            Isaiah’s prognosis is poor. He will be severely mentally and physically handicapped for the
rest of his life. Developmentally, Isaiah is expected to remain in the bottom one percent of children
his age. Although he has some motor function in his arms and legs, his weak torso limits his
independent mobility to rolling and “bunny hopping” on the floor.


 Isaiah cannot feed himself. His
family has to mash or use a blender to soften his food because he cannot chew and swallow on his
own. He will require constant care for the rest of his life. His disabilities will prevent him from ever
living independently.
 

The Verdict
            The court’s charge included two separate broad form negligence questions. Question One
asked: “Did the negligence, as that term is defined below, if any, of Covenant proximately cause the
injury in question to Isiah [sic] Levon Quiroz?” Following Question One, the charge included the
following instruction on negligence:
In order to find Covenant negligent, you must find that: (1) Covenant undertook to render
services to Ward Memorial Hospital which Covenant should have recognized as necessary
for the protection of patients of Ward Memorial Hospital; (2) Covenant failed to exercise
ordinary care in the performance of such specific undertaking; and (3) injury or harm to Isiah
[sic] Quiroz as a patient of Ward Memorial Hospital was proximately caused by reliance of
Ward Memorial Hospital upon Covenant’s undertaking to perform such services.

Question Two inquired: “Did the negligence, if any, of Dr. David William Davison, M.D.
proximately cause the injury in question to Isiah [sic] Levon Quiroz?” The jury answered “no” to
both questions.
FACTUAL SUFFICIENCY
            In her first point of error, Quiroz challenges the jury’s failure to find either defendant
negligent. Factual sufficiency complaints concede conflicting evidence on an issue, but maintain
the evidence against the jury’s finding is so great as to make the finding erroneous. Raw Hide Oil
& Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 275 (Tex.App.--Amarillo 1988, writ
denied). Because Quiroz is challenging an adverse finding on which she had the burden of proof, she
must demonstrate that the verdict is against the great weight and preponderance of the evidence. 
Cruz v. Paso Del Norte Health Found., 44 S.W.3d 622, 629 (Tex.App.--El Paso 2001, pet. denied). 
A factual sufficiency challenge requires us to examine all the evidence. In re King’s Estate, 150
Tex. 662, 244 S.W.2d 660 (1951); Gonzalez v. El Paso Hosp. Dist., 940 S.W.2d 793, 796
(Tex.App.--El Paso 1997, no pet.). We may set aside a verdict only if the evidence is so weak, or
is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. 
Dow Chemical Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). We are not permitted to pass upon
witness credibility, nor will we substitute our judgment for that of the jury even if the evidence
would clearly support a different result. Cruz, 44 S.W.3d at 629. Rather, we will sustain the
challenged finding if the there is competent evidence of probative force to support it. Id. The fact
that we may conclude that the evidence preponderates toward an affirmative answer based on our
review of the record is not an appropriate ground for reversal. Id. When the complaint is to the
jury’s failure to find a fact, we will only reverse when the great weight of the evidence supports an
affirmative answer. Id. 
Covenant’s Negligence?
            As Question One was submitted, Covenant’s alleged negligence was based on a negligent
undertaking theory. See Torrington Co. v. Stutzman, 46 S.W.3d 829, 838 (Tex. 2000). Quiroz had
the burden to prove: (1) Covenant undertook to render services to Ward Memorial Hospital which
Covenant should have recognized as necessary for the protection of patients of the hospital; (2)
Covenant failed to exercise ordinary care in the performance of this specific undertaking; and (3)
injury to Isaiah as a patient was proximately caused by the hospital’s reliance upon Covenant’s
undertaking to perform such services. To reverse, we must determine that the negative answer was
contrary to the overwhelming weight and preponderance of the evidence for each issue upon which
Quiroz had the burden of proof. Sprick v. Sprick, 25 S.W.3d 7, 11 (Tex.App.--El Paso 1999, pet.
denied).
            The existence of an agreement between Covenant and the hospital board of directors is not
in question. The controversy centered on what specific services Covenant agreed to provide. Quiroz
argues that Covenant undertook to provide services specifically aimed at protecting the patients of
the hospital. Her witnesses included James Wurts and Charles Brosseau. Wurts was a senior vice-president of Covenant Heath System. He testified that the services Covenant provides to
management clients includes technical assistance, quality management, educational programs, and
evaluations. If asked, Covenant could also provide continuing education for staff, electronic referral
and consultation, and research materials.
            Brosseau was offered as an expert witness on heath care management and hospital
administration. He testified as to the standard of care applicable to hospital administrators. In his
opinion, operational audits and risk assessment surveys are the primary activities for a prudent
administrator in a new hospital, and Covenant’s failure to take such actions breached the standard
of care.
            Assuming that this evidence establishes Covenant’s undertaking to provide clinical services 
as Quiroz argues, the record contains evidence contrary to her characterization. The terms of the
management agreement specify that the board would remain responsible for hospital operation,
policy, and procedure. The board also retained exclusive responsibility for “all medical, professional 
and ethical affairs of Hospital,” the power to review Covenant’s operating decisions, and the power
to repeal or change policies implemented by the administrator.
            Dyer Moore was the chairman of the hospital board when the agreement was signed. He
testified that the hospital’s financial condition was so severe that the county considered closing the
facility: 
 

We needed someone on [sic] an organization that was familiar with every facet of the
hospital and could run it, every part of our hospital, because just about every part of
the hospital was in bad shape in terms of either its finances or its structure, too many
people from whatever patient load we had, and so we needed someone who could
take over and run the hospital in a financially secure manner on a day-to-day basis.

Given the conflicting evidence, the jury could have reasonably inferred that although Covenant may
have agreed to provide clinical and safety services to other clients, this particular agreement was
limited to financial management, or that the agreement provided for the clinical services “if
requested” and the board never made such a request. The jury’s implied finding that Covenant did
not undertake to provide patient safety services is not against the great weight and preponderance
of the evidence. Without an affirmative finding on the issue of Covenant’s undertaking, Quiroz
failed to carry her burden of proof as to Covenant’s negligence.
Dr. Davison’s Negligence?
            Quiroz next complains that the jury’s answer to Question Two is clearly wrong and unjust
“because it was based upon the inherently incredible testimony of Dr. Davison.” “Central to our
system of justice is reliance on the fact-finder to resolve disputed issues of fact.” Horn v. Hefner,
115 S.W.3d 255, 259 (Tex.App.--Texarkana 2003, no pet.), quoting Jaffe Aircraft Corp. v. Carr, 867
S.W.2d 27, 28 (Tex. 1993). The jury observes all witnesses and determines the weight of an
individual’s testimony. Dubree v. Blackwell, 67 S.W.3d 286, 290 (Tex.App.--Amarillo 2001, no
pet.). A jury is free to believe or disbelieve all or part of any witness’s testimony. Gabriel v.
Lovewell, 164 S.W.3d 835, 847 (Tex.App.--Texarkana 2005, no pet.). Even expert witnesses are
subject to the jury’s role as the judge of credibility and weight to be given testimony. Blackwell, 67
S.W.3d at 290. This remains true even in cases where the jury must be guided by expert opinion
testimony. Lovewell, 164 S.W.3d at 847. Expert opinions are generally not binding on the trier of
fact if more than one possible conclusion can be drawn from the facts. Id. In the face of conflicting
evidence, including conflicting expert testimony, we cannot substitute our own judgment for that of
the jury. See Wyler Indus. Works, Inc. v. Garcia, 999 S.W.2d 494, 499 (Tex.App.--El Paso 1999,
no pet.).
            Essentially, Quiroz contends that Dr. Davison failed to contradict the opinions of her expert
witnesses. Dr. Davison testified as his own medical expert witness and maintained throughout trial
that his treatment of Quiroz and Isaiah did not fall below the standard of care. Dr. Donald Coney
appeared as Quiroz’s obstetrical expert. He offered numerous examples demonstrating that Dr.
Davison failed to abide by the standard of care. He opined that Dr. Davison’s inability to define
“deceleration” during his deposition was below the standard of care for a family practice doctor who
delivers babies. Dr. Davison explained his lack of precision this way: 
A: I didn’t describe it right when I talked to Mr. Lyons. I know that, but I wasn’t
hung up on the exact definition of it. I was looking at the severity of that case, and
then, in my mind, I was thinking that’s talking about really worrisome decelerations
would be below a hundred, so I answered him that way. I wasn’t hung up on a
textbook definition of what a deceleration was like I’m having to do here now. 
 
Q: Okay. So that was just a loose definition at the time?
 
A: Yes, sir.

Dr. Coney also testified that a C-section should have been performed at 7:50 a.m., and that waiting
for a scrub nurse to arrive was below the standard of care. Dr. Davison countered that he could not
operate safely without the scrub nurse. He explained that the rest of the staff present that morning
had individual jobs to do and were not available to take over the scrub nurse’s duties. There was
also evidence that none of the other staff members had the specialized training required to serve as
a scrub nurse. 
            Next, Dr. Coney criticized Dr. Davison for using the Mity-vac for more than one pull. 
According to Dr. Coney, Dr. Davison should have recognized that the vacuum was having a negative
impact on the baby’s condition. Dr. Davison responded that although he recognized the
nonreassuring heart rate patterns, he felt the baby’s head move and believed Isaiah was going to be
delivered vaginally until the last pull. 
            Quiroz also cites several instances where Dr. Davison’s trial testimony differed from his
deposition testimony. These assertions go straight to witness credibility and the weight to be given
his testimony. See McShane v. Bay Area Healthcare Group, Ltd., 174 S.W.3d 908, 916-17
(Tex.App.--Corpus Christi 2005, pet. filed)(using prior inconsistent statement in former patient’s
medical record to impeach physician’s credibility). That falls within the sole province of the jury.
Carr, 867 S.W.2d at 28. We are not a fact finder; we are not permitted to pass upon witness
credibility, nor will we substitute our judgment for that of the jury. Cruz, 44 S.W.3d at 629. The
jury chose to believe Dr. Davison and gave his testimony greater weight than the other experts. See
Rubio, 24 S.W.3d at 468. Because there is competent evidence to support the jury’s negative
answers, the verdict is not against the great weight and preponderance of the evidence. See Cruz,
44 S.W.3d at 629. We overrule Issue One.
EVIDENTIARY ISSUES
Standard of Review
            We review evidentiary rulings for an abuse of discretion. Sears, Roebuck & Co. v. Abell, 157
S.W.3d 886, 897 (Tex.App.--El Paso 2005, pet. denied). A trial court abuses its discretion when it
takes action without reference to any guiding rules or principles. Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). To prevail, Quiroz must show that the trial court’s error
was calculated to cause and probably did cause the rendition of an improper judgment. Abell, 157
S.W.2d at 897.
Parol Evidence
            In Issue Two, Quiroz complains the trial court abused its discretion by excluding evidence
concerning the management agreement between Covenant and the hospital.


 At issue are portions
of the testimony of three witnesses and a collection of newspaper articles. Hospital administration
expert Charles Brosseau was not permitted to testify on the issue of Covenant’s obligations under
the management agreement. Former board member Dyer Moore was not allowed to explain how the
terms “manage” and “operate” were defined between the parties. Steve Holmes, who worked for
Covenant as the administrator in charge of the hospital in 1998, was prevented from testifying as to
Covenant’s obligations of “supervising, managing and operating.” The newspaper articles contained
details of the negotiations between the hospital and Covenant before the management agreement was
signed.
            This evidence was extrinsic to the management agreement. Extrinsic evidence is admissible
only after the trial court first determines that the contract is ambiguous. Nat’l Union Fire Ins. Co.
v. CBI Indus. Inc., 907 S.W.2d 517, 520 (Tex. 1995); Kelly v. Rio Grande Computerland Group, 128
S.W.3d 759, 768 (Tex.App.--El Paso 2004, no pet.). Whether there is an ambiguity is a question of
law for the court to decide in light of the circumstances present at the time the contract was signed.
Kelly, 128 S.W.3d at 768. A contract can be ambiguous on its face, (“patent ambiguity”) or as
applied to the subject matter which it governs (“latent ambiguity”). Id. In the case of a latent
ambiguity, extrinsic evidence is admissible for the purpose of applying the contract to the subject
matter that it governs. Nat’l Union Fire, 907 S.W.2d 517, 520; citing Murphy v. Dilworth, 137 Tex.
32, 151 S.W.2d 1004, 1005 (Tex. 1941); see also Bache Haldey Stuart Shields, Inc. v. Alamo Sav. 
Ass’n, 611 S.W.2d 706, 708 (Tex.Civ.App.--San Antonio 1980, no writ.). But the ambiguity must
become evident before parole evidence of intent is admitted. Nat’l Union Fire, 907 S.W.2d at 521. 
In other words, extrinsic evidence of the parties’ intent cannot be used to create an ambiguity. 
Friendswood Dev. Co. v. McDade & Co., 926 S.W.2d 280, 283 (Tex. 1996).
            Here, the trial court determined the contract was unambiguous. Quiroz did not challenge that
ruling at trial and she does not argue ambiguity now. Instead, she complains that the evidence was
admissible to “explain the subject matter of the contract.” She wanted to show how Covenant and
the hospital board defined the terms “manage,” “operate” and “supervise.” But there is no evidence
that the contracting parties disagreed over the definitions or applications of these terms during their
relationship. Without some evidence of a latent ambiguity, the evidence was inadmissible. We
overrule Issue Two.
Causation
            In Issue Three, Quiroz challenges the exclusion of expert testimony on causation. Her
hospital administration expert was not allowed to opine that Isaiah’s injury was foreseeable to a
reasonable administrator. The trial court determined that without medical expertise, the witness did
not have the requisite knowledge or experience to testify.
            Rule 702 contains three requirements for the admissibility of expert testimony: (1) the
witness must be qualified; (2) the proposed testimony must be scientific, technical, or require
specialized knowledge; and (3) the testimony must assist the trier of fact to understand the evidence
or to determine a fact issue. Tex.R.Evid. 702; Burns, 125 S.W.3d at 593, citing E.I. du Pont de
Nemours & Co. v. C.R. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). Whether an expert is qualified
is a preliminary question for the trial court. Reed v. Granbury Hosp. Corp., 117 S.W.3d 404, 410
(Tex.App.--Fort Worth 2003, no pet.). The proponent must prove the expert witness possesses
special knowledge as to the actual subject on which he is offering an opinion. Burns, 125 S.W.3d
at 593.
            Quiroz offered Charles Brosseau as her expert on hospital administration. His administrative
qualifications were extensive. Brosseau has a master’s degree in Heath Care Administration and is
board certified by the American College of Health Care Executives. He served as an administrator
for several large hospitals and hospital systems in Texas. He has also worked as an administrative
consultant for Washington D.C. General Hospital and the M.D. Anderson Cancer Network in
Houston. But Brosseau is not a doctor and does not have medical training. Admissible expert 
testimony is limited to the scope of the expert’s qualifications. See Broders v. Heise, 924 S.W.2d
148, 152 (Tex. 1996). The trial court must ensure “that those who purport to be experts truly have
expertise concerning the actual subject about which they are offering an opinion.” Id. The specific
issue in this instance was whether a hospital administrator could have foreseen Isaiah’s injury. To
answer this question, a qualified expert needed more than a general understanding that the lack of
oxygen has the potential to cause brain damage. See Esquivel v. El Paso Healthcare Systems, Ltd., 
No. 08-04-00300-CV, 2005 WL2044926 at *5 (Tex.App.--El Paso Aug. 25, 2005, no pet.)(holding
that nursing expert was not qualified to testify on causation because she had no expertise in
diagnosing the alleged injury); see also Costello v. Christus Santa Rosa Health Care Corp., 141
S.W.3d 245, 248 (Tex.App.--San Antonio 2004, no pet.)(holding that registered nurse was not
qualified to express opinion on cause of patient’s death).
            Brosseau’s experience and training certainly gives him more than a lay person’s
understanding that administrative negligence can contribute to patient injury. But there is no
evidence that he had any medical expertise in the diagnosis of brain injuries or how the specific
administrative failures he identified could have contributed to one. His opinion was mere
speculation and amounts to no evidence at all. See Broders, 924 S.W.2d at 153 (holding that general
medical expertise did not qualify physician to testify on causation without proof that he had
experience or training in neurosurgery); see also Pack v. Crossroads, Inc., 53 S.W.3d 492, 507
(Tex.App.--Fort Worth 2001, pet. denied)(qualification in general field of nursing was not sufficient
for witness to testify on standard of care applicable to nursing home).
            Quiroz cites Mills v. Angel


 for the proposition that a hospital’s negligence is not necessarily
dependent on a doctor’s negligence. See Angel, 995 S.W.2d at 267. It is true that a hospital’s
liability can be independent of a physician’s negligence. See id. at 267-68. It does not necessarily
follow, however, that an administrative expert without any medical training is qualified to testify that
a permeant and debilitating brain injury was foreseeable. Quiroz still had to prove that Brosseau was
qualified to give an opinion on this particular issue. Broders, 924 S.W.2d at 152; Burns, 125 S.W.3d
at 593. This she failed to do. See Broders, 924 S.W.2d at 153. 
            Even assuming error occurred, it was harmless. Brosseau was not the only expert witness
to testify on the issue of administrative foreseeability. Dr. Coney was permitted to testify on the
cause of Isaiah’s injuries.
Q: And is it foreseeable to those responsible for managing, operating, and
supervising the labor and delivery unit of a hospital that babies may need
resuscitation?
 
A: Yes.
 
Q: Is it foreseeable to those persons responsible for operating, managing, and
supervising a hospital that the necessary personnel to perform a stat C-section should
be available?
 
A: Yes.
 
Q: And that those -- that could result in an increased length of time of hypoxia?

. . .
 
A: Yes.
 
Q: Yes. Is that opinion to a reasonable degree of medical probability?
 
A: Yes.

Brosseau’s testimony would have been cumulative and not dispositive of the case. See Able, 35
S.W.3d at 617. Finding no abuse of discretion, we overrule Issue Three.
Reliability of Expert Opinion
            In Issue Four, Quiroz challenges the exclusion of Dr. Coney’s opinion linking permanent
brain injury and cerebral palsy. Rule 702 requires an expert’s opinion to be both relevant and
reliable. Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). An opinion based on
unreliable scientific data is inadmissible as it is nothing more than the expert’s subjective belief or
speculation. Robinson, 923 S.W.2d at 557. The trial court must determine not whether the expert’s
conclusions are correct, but only whether the analysis is reliable considering all the evidence. Keo
v. Vu, 76 S.W.3d 725, 734 (Tex.App.--Houston [1st Dist.] 2002, pet. denied); Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 718-19 (Tex. 1998). A trial court properly excludes
expert testimony as unreliable if: (1) the foundational data underlying the opinion is unreliable; (2)
the methodology used by the expert to interpret the underlying data is flawed; (3) notwithstanding
the validity of the underlying data and methodology, there is an analytical gap in the expert evidence;
or (4) the expert fails to rule out other plausible causes. Allstate Texas Lloyds v. Mason, 123 S.W.3d
690, 698 (Tex.App.--Fort Worth 2003, no pet.).
            In Robinson, the Texas Supreme Court identified six non-exclusive factors to guide the trial
court in determining the reliability of scientific expert testimony: (1) the extent to which the theory
has been or can be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to peer review and/or
publication; (4) the technique’s potential rate of error; (5) whether the underlying theory or technique
has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial
uses which have been made of the theory or technique. Robinson, 923 S.W.2d at 557. 
            Quiroz intended for Dr. Coney to opine that Isaiah suffered from a prolonged lack of oxygen 
resulting in tissue damage while Dr. Davison waited to perform the C-section. Dr. Coney opined
that after ten to seventeen minutes of oxygen depravation, brain tissue dies resulting in severe
neurological damage and sometimes death. Underlying this opinion are Dr. Coney’s assertions that
(1) he could determine how long and to what degree Isaiah was deprived of oxygen based on the fetal
monitor strips, and (2) he could determine the pH level or acidity of Isaiah’s blood based entirely on
clinical information in the medical chart.
            The correlation between intrauterine oxygen depravation and brain damage is a complex
issue which the medical community is struggling to understand. There was extensive discussion at
trial about an article published by The American College of Obstetricians & Gynecologists and The
American Academy of Pediatrics entitled Neonatal Encelphalopathy and Cerebral Palsy; Defining
the Pathogenesis & Pathophysiology (the “Green Journal”). The Green Journal listed four essential
criteria to determine when intrapartum hypoxia is sufficient to cause cerebral palsy. The first criteria
requires evidence of fetal acidosis in umbilical cord blood obtained at delivery. Acidosis is the
medical term used when the body’s pH level drops below 7.2. At this level, the acid begins to kill
cells and tissue. Blood pH levels are measured with a laboratory blood gas test. Isaiah’s blood was
not tested for a pH level.
            During the Robinson hearing, Dr. Coney testified not only to the complexity of this issue but
also about his lack of professional experience with similar injuries. His obstetrical experience with
babies born with low APGAR scores was limited to birth and the first few hours of life. Although
it was his practice to “keep up with” such patients, he could not remember delivering a baby with
neurological damage related to hypoxic ischemic encephalopathy. He had no experience with babies
born with a pH level below seven, and those born with low APGARs recovered rapidly. His clinical
experience with long term hypoxic insults was limited to cases brought to his attention through the
review systems in the hospitals where he practiced. Dr. Coney also testified that in his practice he
had always relied on laboratory analysis of umbilical cord blood for pH testing. There is no evidence
that he has ever used his method of determining pH levels without a lab test in his medical practice.
            Basic to the scientific method is the premise that conclusions are the result of analysis. See
Robinson, 923 S.W.2d at 559. In other words, “coming to a firm conclusion first and then doing
research to support it is the antithesis of this [scientific] method.” Robinson, 923 S.W.2d at 559
quoting Claar v. Burlington Northern R.R., 29 F.3d 499, 502-03 (9th Cir. 1994). Without a blood
gas test, Dr. Coney had to search the medical record for clinical indications that Isaiah’s pH was
below seven at birth. This goal-oriented reasoning is contrary to the foundation of the scientific
method. See Robinson, 923 S.W.2d at 559.
            There is no evidence that it is possible to determine a pH level in a new born without a blood
gas test other than Dr. Coney’s testimony that he could do so. There is also no explanation of how
the fetal monitor strip and Isaiah’s symptoms pointed to a low pH level other than Dr. Coney’s
statement that “the clinical manifestations of the infant at the time of delivery are certainly
compatible with that finding.” Even if we assume it is possible to determine the pH level and the
length of the hypoxic episode by Dr. Coney’s methods, there is no evidence that what the doctor
believed could have happened to Isaiah actually did happen. Gammill, 972 S.W.2d at 726. 
            With regard to the correlation between the length of hypoxic insult and permeant brain
damage, Dr. Coney relied on several studies in forming his opinions. However, he did not produce
the literature for trial and was not able to testify to the rates of error for the studies. Lack of
supporting literature does not make and expert’s opinion inherently unreliable. Keo, 76 S.W.3d at
735. But unlike the expert in Keo, Dr. Coney had no experience applying his methods in his medical
practice. The trial court acted well within its discretion in questioning the reliability of his
methodology without experience or authoritative literature to support it.
            Finally, there is the question of the non-judicial uses of the methodology. There aren’t any.
Dr. Coney has written on the subjects of intrapartum hypoxia, brain damage, and cerebral palsy only
in the context of ligation. While this factor alone will not render an expert’s opinion unreliable
per se, “opinions formed solely for the purpose of testifying are more likely to be biased toward a
particular result.” Robinson, 923 S.W.2d at 559. The trial court could properly consider that bias
in determining the reliability of the opinion. See id. We overrule Issue Four. 
Improper Questioning
            Issue Five raises the propriety of a question during the cross-examination of Dr. Coney when
opposing counsel referenced his 4590i expert report.


 We review an improper question under the
same standard applied to improper jury argument. See Luna v. North Star Dodge Sales, Inc., 667
S.W.2d 115, 120 (Tex. 1984). Quiroz must show: (1) an error; (2) that was not invited or provoked;
(3) that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; and
(4) was not curable by an instruction, a prompt withdraw of the statement, or a reprimand by the
judge. Standard Fire Ins. Co. v. Reese, 584 S.W. 2d 835, 839-40 (Tex. 1979); Cooper Tire &
Rubber Co. v. Mendez, 155 S.W.3d 382, 409 (Tex.App.--El Paso 2004), rev’d on other grounds,
204 S.W.3d 797 (Tex. 2006).
            Covenant’s attorney asked Dr. Coney: “Now, even though you started to review the case in
November of 2003, you formed your opinions in that month, November of 2003, and did some sort
of a report back then, didn’t you?” Quiroz’s attorney objected that the report was a statutorily
required medical expert report and was not admissible. Patriacca v. Frost, 98 S.W.3d 303, 304
(Tex.App.--Houston [1st Dist.] 2003, no pet.); see Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§
1.01-12.01, 1977 Tex.Gen.Laws 2039-53 (repealed 2003). The trial court sustained the objection,
instructed the jury to disregard, and denied the motion for mistrial.
            Quiroz complains that a mistrial was necessary because the harm was incurable. She must
show that the probability the question caused harm is greater than the probability the jury decided the
case based on proper proceedings and evidence. Cooper Tire, 155 S.W.3d at 410. We consider all
the evidence to determine incurable harm. Standard Fire Ins. Co., 584 S.W. 2d at 839-40. To
determine whether the nature, degree and extent of the improper question created an incurable error,
we must consider how long it continued, whether it was repeated or abandoned, and whether there
was cumulative effect. Standard Fire Ins. Co., 584 S.W.2d at 840.
            The record includes the testimony of seventeen witnesses over two weeks of trial. The
improper question is a single instance which defense counsel quickly abandoned. We are not
persuaded that this arises to the level of incurable error. We overrule Issue Five. Having overruled
all of issues for review, we affirm the judgment of the trial court.
 
 
March 8, 2007                                                             
                                                                                    ANN CRAWFORD McCLURE, Justice
 
Before Chew, C.J., McClure, and Barajas, C.J. (Ret.)
Barajas, C.J. (Ret.), sitting by assignment, not participating